**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Damen Anthony DAVIS, Defendant–Appellant.**

No. 01–10739.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 10, 2002.

Filed June 11, 2003.

Michael K. Powell, Assistant Federal Public Defender, Reno, NV, for the defendant-appellant.

Ronald C. Rachow, Assistant United States Attorney, Reno, NV, for the plaintiff-appellee.

Before: KOZINSKI and KLEINFELD, Circuit Judges, and KARLTON, District Judge.[1]

Opinion by Judge KARLTON; Opinion concurring in part and dissenting in part by Judge KLEINFELD.

## OPINION

KARLTON, District Judge:

Damen Anthony Davis appeals the denial of his motion to suppress as evidence a shotgun and the statements he made following the search that led to its discovery. We conclude that the motion should have been granted and thus reverse the contrary orders of the district court.

## FACTS

In February 2000, the police in Sparks, Nevada, were investigating an incident involving a game of Russian roulette that had ended in a shooting death. The police sought to locate Davis when they learned that he might have witnessed the incident.

On the morning of February 24, 2000, police officers Susich, Dyer and Benedetti

---

1. The Honorable Lawrence K. Karlton, Senior United States District Judge for the Eastern District of California, sitting by designation.

visited Jessica McMannis at her place of employment. McMannis leased an apartment with Stephanie Smith and shared a bedroom with Davis in that apartment. When asked about Davis' whereabouts, McMannis lied to the police and told them that she did not know where he lived. She apparently concluded that the police did not believe her, because, according to her testimony, after they left, she called Stephanie Smith to warn her that the police were coming and told Smith not to let them into the apartment.

Indeed, the officers did go to the apartment. When they arrived, Smith was the only person there. She allowed the officers to enter and provided them with oral and written consent to search the premises. Smith also provided the officers with a copy of the lease, which listed only Smith and McMannis as tenants.

The apartment had two bedrooms. Smith slept in the first bedroom and McMannis and Davis slept in the second bedroom. Smith told the officers, according to Detective Benedetti's testimony, that the second bedroom was occupied not by her, but by McMannis and Davis, and that Davis' belongings were in that room. Davis kept all his belongings in that bedroom. When the officers entered the bedroom, they found Davis' belongings there. Under the bed, they found a black gym bag. The officers opened the gym bag and discovered the shotgun. Detective Benedetti testified that he left his business card with a note asking Davis to contact him because he believed, based on Smith's statements, that Davis lived there. The police did not look for Davis at any other address.

Officer Dyer, who was last to testify regarding the search, provided an account that was, in several respects, at odds with the testimony of all of the other witnesses. For instance, Dyer testified that Smith had told the officers that the room where Davis' belongings were found was a "spare" room, that McMannis did not reside in the apartment at all despite the presence of her name on the lease, and that no areas of the apartment were "off limits" to her. Dyer acknowledged that he did not document any of these alleged statements, either in his report or his notes. On cross-examination, Dyer also admitted that Smith had told the officers that Davis' belongings were located in the bedroom where the gun was eventually found.

Approximately four hours after the search, Davis voluntarily met with Detective Benedetti at the police station. Davis was neither placed under arrest nor given *Miranda* warnings. Under interrogation, he admitted that he had been in possession of the shotgun for approximately three weeks. Benedetti testified that he was "probably" aware at the time of the interview that Davis was an ex-felon and could not legally possess the shotgun, and that Davis' admission was "most likely" in response to his questions regarding the gun.

On March 13, 2000, police officers went to the apartment in order to arrest Davis. When they arrived, McMannis led them to the bedroom, where Davis was sleeping on the same bed under which the shotgun had been found.

Davis was indicted for possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2). He moved to suppress both the shotgun and the statements he had made to Benedetti. After a hearing at which Susich, Benedetti, Dyer and McMannis testified, the district court denied the motion from the bench. The court made no findings of fact, but concluded that Davis did not have standing to object to the search and that, even if he did have standing, the search was legal because there was valid third-party consent. The court dismissed Davis'

claim that his incriminating statements should be suppressed as "fruit of the poisonous tree" because it concluded that the search was lawful. Davis entered a conditional plea of guilty, preserving his right to appeal the denial of the motion, and this timely appeal followed.

## ANALYSIS

■ Where, as here, no findings of fact were made by the district court, "this court will uphold the denial of the motion to suppress if there is a reasonable view of the evidence that will sustain it." *Guam v. Palomo*, 35 F.3d 368, 375 (9th Cir.1994); *United States v. Rabe*, 848 F.2d 994, 997 (9th Cir.1988).

## I. LEGITIMATE EXPECTATION OF PRIVACY

■ Because the Fourth Amendment protects "people, not places," *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), Davis must first demonstrate that he personally had a "legitimate expectation of privacy" in the place searched or the thing seized. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In the absence of such an expectation, Davis' motion fails.[2]

The government argues that Davis lacked an expectation of privacy in the apartment because he was not a lessee and because the evidence indicates that he stayed at the apartment only occasionally. The record suggests that Davis was more than simply an occasional houseguest. Even assuming that the government's view of the evidence is correct, however, the

argument is misplaced. It is well-established that Davis' status as an overnight guest is enough, in itself, to establish that he had an expectation of privacy in the apartment. *See Minnesota v. Olson*, 495 U.S. 91, 96–97, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *United States v. Gamez–Orduno*, 235 F.3d 453, 458 (9th Cir.2000) ("Whether or not he can show indices of residency (such as keys to the premises or the ability to come and go and admit or exclude others), an overnight guest in another's home has a reasonable expectation of privacy . . . ."). Moreover, the question before us is not whether Davis had a legitimate expectation of privacy in the contents of the apartment generally, but whether he could reasonably believe that the contents of his gym bag would remain private.

■ "A person has an expectation of privacy in his or her private, closed containers" and "does not forfeit that expectation of privacy merely because the container is located in a place that is not controlled exclusively by the container's owner." *United States v. Fultz*, 146 F.3d 1102, 1105 (9th Cir.1998) (finding defendant had reasonable expectation of privacy in cardboard boxes stored in another person's garage); *see also United States v. Welch*, 4 F.3d 761, 764 (9th Cir.1993) (finding defendant had reasonable expectation of privacy in her purse left in a rental car). The government does not suggest, and we do not conclude, that Davis had less of a legitimate expectation of privacy in his gym bag than one would have in a suitcase, a purse, a briefcase or a cardboard box. *See United States v.*

---

**2.** The district court framed this issue as a question of "standing," and the government, in its brief, does likewise. "Although this issue is often discussed in terms of 'standing' to invoke the Fourth Amendment, the Supreme Court has repeatedly cautioned against invoking this concept." *United States v. Nerber*, 222 F.3d 597, 599 n. 1 (9th Cir.2000). "[I]n determining whether a defendant is able

to show the violation of his . . . Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1988) (quoting *Rakas v. Illinois*, 439 U.S. 128, 140, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)).

*Medina–Verdugo*, 637 F.2d 649, 653 (9th Cir.1980) (Kennedy, J.) ("We assume, moreover, because the Government has not argued to the contrary, that the gym bag searched here is the equivalent of a closed suitcase to which an expectation of privacy attaches.").

At oral argument, the parties were uncertain as to whether the record confirmed that Davis' bag was closed at the time that the officers found it. In his brief to the district court, however, Davis asserted that the officers found his bag under the bed and then opened it, and the government stipulated to these facts in its opposition brief. We have held that factual stipulations in a trial brief may be treated as "judicial admissions." *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226–27 (9th Cir.1988). Such admissions, which "have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact," are binding on both the parties and the court, including this court. *Id.* at 226 (internal quotation marks omitted). Moreover, the government does not argue here, and we find no reason to suppose, that Davis' bag was not closed.[3]

The fact that Davis stored his bag under a bed, even though the bed was not exclusively under his control, strongly supports our conclusion that his expectation of privacy in the bag was reasonable. *See United States v. Haydel*, 649 F.2d 1152, 1154–55 (5th Cir. Unit A July 1981) (holding that defendant had reasonable expectation of privacy in gambling records stored under his parents' bed; although "he did not reside regularly at his parents' home, he kept clothing there and had occasionally remained overnight"); *cf. United States v. Ramos*, 12 F.3d 1019, 1025–26 (11th Cir.1994) (holding that defendant had expectation of privacy in a briefcase placed beneath the bed, even though he had overstayed his lease). Quite simply, by placing his gym bag under the bed, Davis "manifested an expectation that the contents would remain free from public examination." *United States v. Chadwick*, 433 U.S. 1, 11, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *see Haydel*, 649 F.2d at 1154 ("[I]t is clear from his actions that Haydel exhibited a subjective expectation that the contents of the box stowed under his parents' bed were to remain private."). We find that his expectation was reasonable. If the Fourth Amendment does not protect Davis' expectation of privacy in the contents of his bag, stored under the bed in an apartment where he sleeps and keeps his belongings, we find it difficult to imagine what the Fourth Amendment does protect.

## II. THIRD PARTY CONSENT

Having determined that Davis had a legitimate expectation of privacy in his bag, we must next decide whether

---

**3.** Because the search was without a warrant, the government bears the burden of demonstrating that the search was lawful. *See United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir.1991) (per curiam). Thus, if the government were relying on some notion of plain sight, it would be required to produce evidence that the gym bag was open. It did not do so. Nor could it satisfy its burden premised on Smith's consent, since, as we explain below, that consent could not extend to the bag. Moreover, even if the bag had been open, the fact that it was stored under the bed, thus requiring the police to move it, would have required probable cause, since such movement would constitute a search. *See Arizona v. Hicks*, 480 U.S. 321, 324–25, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (holding that an officer's movement of stereo components to examine their serial numbers was a search within the meaning of the Fourth Amendment).

The fact that the condition of the bag was undisputed in the district court, that Smith's consent could not extend to the bag, and that it was stowed under the bed, undoubtedly accounts for the government's reticence regarding a plain-sight justification.

Smith had authority to consent to the search. The government has the burden of establishing the effectiveness of Smith's consent. *See Welch,* 4 F.3d at 764 (citing *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)). To meet its burden, the government must demonstrate that Smith had either actual or apparent authority to consent to the search. *See Fultz,* 146 F.3d at 1105; *Welch,* 4 F.3d at 764.

### 1. Actual Authority

 "A third party has actual authority to consent to a search of a container if the owner of the container has expressly authorized the third party to give consent or if the third party has mutual use of the container and joint access to or control over the container." *Fultz,* 146 F.3d at 1105; *Welch,* 4 F.3d at 764. Because there is nothing in the record to suggest that Smith had express authorization from Davis to consent to a search of the bag, the government must prevail on a mutual use and joint access or control theory in order to demonstrate actual authority.

The government argues that even if Davis had a reasonable expectation of privacy in his bag, the search was legal because Smith validly consented to a search of the apartment and, as an occupant and lessee, she had authority to give consent to search anywhere on the premises. We rejected nearly identical arguments in *Welch* and again in *Fultz. Welch* held that a person cannot give the police permission to search someone else's purse even if the purse is located in a car over which both persons have control. 4 F.3d at 764 ("The shared control of 'host' property does not serve to forfeit the expectation of privacy in containers within that property.") (citing *United States v. Karo,* 468 U.S. 705, 725–27, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (O'Connor, J., concurring)). In *Fultz,* the police had searched the appellant's cardboard boxes, which were stored in the garage of a house where he was staying intermittently. The court concluded that the relevant question was not whether the owner of the house "had access to the *garage,* but whether she had mutual use and joint access to or control over the *boxes." Fultz,* 146 F.3d at 1106. Because the record here, as in *Welch* and *Fultz,* does not in any way intimate that Smith had mutual use and joint access to or shared control over Davis' gym bag, it is clear that Smith lacked actual authority to consent to a search of the bag.[4]

---

4. While we believe that our opinion needs no further amplification, respect for the dissent requires a brief discussion of the two cases it believes we slighted. Our conclusion today is in no way inconsistent with *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Indeed, the test that we used to determine whether a third party possesses actual authority to consent, as outlined in both *Welch* and *Fultz,* comes straight out of *Matlock.* There, the Court explained that "[t]he authority which justifies the third-party consent does not rest upon the law of property ... but rests rather on mutual use of the property by persons generally having joint access or control for most purposes." *Id.* at 171 n. 7, 94 S.Ct. 988. Unlike the situation in *Matlock*—where the third party jointly occupied a bedroom with the defendant and shared a dresser with him in that bedroom, and explained these facts to the police before they searched the bedroom—nothing in the record here indicates that Smith had mutual use of and joint access to or control over Davis' bag, the bed under which it was stored, or even the bedroom in which it was discovered.

Nor can we agree with the dissent's suggestion that the search should be upheld because Davis somehow "assumed the risk that [Smith] might permit the common area to be searched." *Id.* Davis' bag was not left in the kitchen or the living room; it was hidden under the bed in the bedroom he shared only with McMannis. By staying in a shared house, one does not assume the risk that a housemate will snoop under one's bed, much less permit others to do so. Short of attach-

## 2. Apparent Authority

 "Under the apparent authority doctrine, a search is valid if the government proves that the officers who conducted it reasonably believed that the person from whom they obtained consent had the actual authority to grant that consent." *Welch*, 4 F.3d at 764; *Fultz*, 146 F.3d at 1105. The government contends that the officers reasonably believed that Smith had authority to consent to a search of the entire apartment. Again, however, we stress that the relevant question is whether the officers reasonably believed that Smith had authority to consent to a search of Davis' bag. And again, the situation here is not materially distinguishable from the situation confronted by the court in *Fultz*.

Smith indicated to the officers which bedroom was occupied by Davis and McMannis and stated that Davis occasionally stayed there. Although Officer Dyer testified that Smith told them the bedroom was a "spare" room, he also testified that Smith informed them that Davis' belongings were in the room. Because the officers were aware that Davis' belongings were in a specific area separate from Smith's belongings, they could not reasonably believe that she had control over them. *See Fultz*, 146 F.3d at 1106 (finding no apparent authority where officers were aware that appellant's boxes were in a specific area and homeowner informed them that the boxes were appellant's).

Thus, the officers were aware of the actual facts that established Smith's lack of authority to consent to the search of Davis' bag.

 Given the circumstances, to the extent that the officers believed that Smith's consent to search the apartment legally authorized them to search Davis' bag, they were either indifferent to known facts or mistaken as to the law. The apparent authority doctrine, however, is applicable only if the facts believed by the officers would justify the search as a matter of law. *See Welch*, 4 F.3d at 764–65. An officer's mistaken belief as to the law, even if reasonable, cannot establish apparent authority. *Id.*

In sum, Smith had neither actual nor apparent authority to consent to the search. Because Davis had a reasonable expectation of privacy in the gym bag, and because the government failed to carry its burden of demonstrating that Smith's consent was valid, we hold that the search was illegal.

## III. FRUIT OF THE POISONOUS TREE

 Finally, we must consider Davis' argument that the statements he made to Detective Benedetti following the search should be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The standard

---

ing to the bag an explicit "No Trespassing" sign with his name on it, Davis could hardly have displayed a clearer "exhibition of an actual expectation of privacy," *United States v. Sledge*, 650 F.2d 1075, 1077 n. 2 (9th Cir. 1981).

We have rarely applied the "assumption of risk" analysis urged by the dissent, and the few cases in which we have done so have involved situations where the person whose property was searched clearly ceded authority over the property, either partially or totally, to

the consenting third party. *See, e.g., United States v. Kim*, 105 F.3d 1579 (9th Cir.1997) (holding defendant assumed risk that third party would consent to search of storage locker, where defendant instructed third party to rent locker under third party's name and allowed third party to keep possession of lease papers and to occasionally retain the keys); *Sledge*, 650 F.2d at 1080 n. 10 (explaining parameters of the doctrine). The instant circumstances come nowhere near such a situation.

articulated in *Wong Sun* remains the relevant test. As the court there explained, the "question in such a case is whether, granting establishment of the primary illegality', the evidence to which [the] instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (internal quotation marks omitted). There are three exceptions to this exclusionary rule: (1) the independent source exception; (2) the inevitable discovery exception; and (3) the attenuated basis exception. *See United States v. Smith,* 155 F.3d 1051, 1060 (9th Cir.1998). Because the independent source exception is irrelevant here, we discuss only the last two exceptions.

■ The government argues that Davis was already known to the police, because they were searching for him in connection with the Russian roulette incident, and thus nothing learned from the search led to the interview or Davis' statement at the interview. If, by this argument, the government means to suggest that Davis' statements should not be suppressed because the information thereby revealed "inevitably would have been discovered by lawful means," *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the argument is without merit. The assertion establishes no more than the obvious fact that the police would probably have sought Davis out even if the search had not been conducted. The government cannot take advantage of the inevitable discovery exception because it has not pointed to any evidence demonstrating that the police would inevitably have found out that Davis possessed a shotgun. Put directly, in the absence of the search, the police would have known nothing about the shotgun and would thus have had no occasion to question Davis about its possession.

■ The facts also do not support a conclusion that the link between the search and Davis' statements is so attenuated as to dissipate the taint of the search's illegality. All that Davis need show is that the seized shotgun "tend[ed] *significantly to direct* the investigation toward the specific evidence sought to be suppressed." *United States v. Smith,* 155 F.3d 1051, 1061 (9th Cir.1998) (alteration in original) (quoting *United States v. Cales,* 493 F.2d 1215, 1216 (9th Cir.1974)). Because Davis seeks to suppress testimonial evidence, the appropriate inquiry is whether Davis testified without coercion and whether the fruits of the search induced his testimony. *See id.* at 1062.

At the time of the interview, a few hours after the search, Benedetti was aware that Davis was an ex-felon for whom possession of a firearm was a crime and that a shotgun had been found among Davis' belongings. He questioned Davis about the gun and, in response, Davis admitted to owning the gun. Under the circumstances, it cannot be doubted that the search of Davis' bag led directly to his incriminating statements. Given the direct causal link between the search and the statements and the absence of any applicable exception, we conclude that the district court should have suppressed Davis' statements as fruit of the poisonous tree.

## CONCLUSION

The district court's denial of Davis' motion to suppress is **REVERSED** and the case is **REMANDED** for further proceedings consistent with this opinion.

KLEINFELD, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent.

Like the majority, I reject the government's argument that Davis lacked standing under *Rakas v. Illinois*[1] to contest the

---

**1.** 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

search of his bag. As a houseguest in the apartment, he had standing to assert his own legitimate expectation of privacy in his hostesses' home under *Minnesota v. Olson.*[2]

I dissent from the conclusion, because the majority decision improperly extends *United States v. Fultz.*[3] The majority errs partly in its reading of the record, and partly in its understanding of the law on closed container searches.

First, the facts. A man had died of a gunshot wound to the head and the police had learned that Davis was at the scene. They wished to speak with Davis. It turned out that, so far as the police learned, the man shot himself in the head "playing" Russian roulette.

The police asked a woman, Jessica McMannis, who worked in the Reno Police Department dispatch center, if Davis lived at the apartment that was searched. It turns out he did, with her, but she did not tell the police that. She lied, to deceive them into thinking Davis did *not* live there. McMannis testified at the suppression hearing that Davis lived at the apartment, and shared a room with her. But she admitted at the hearing that she had lied to the Sparks police when they asked her before the search if she knew where Davis lived. After she lied and told the police that she "did not know" where Davis lived, she called her roommate Stephanie Smith and told her the police were coming and not to open the door. McMannis, a twenty year old with a baby, also lied about where she lived. She told the police that she lived at her parents' house in Sun Valley. And she apparently lied to police when she told them that she only signed the apartment lease to help her friend Stephanie Smith because Smith had credit problems, not because she was a co-tenant.

The police had no knowledge, so far as the record shows, that McMannis was lying to them. They went to the apartment having been informed that McMannis did not live there, and did not know where Davis lived. Nor did police know that McMannis was lying about her signature on the lease. For all they knew, Smith was the apartment's only tenant. Thus, based on what McMannis had told them, they had no reason to think they were invading her privacy or Davis's by looking into the room where McMannis and Davis lived or into the bag there that turned out to be Davis's.

The woman who was in the apartment when the police came, Stephanie Smith, also lied, though not so egregiously as McMannis. Despite McMannis's secret instructions, Smith let the police in when they arrived at the apartment. The police asked to see the lease to determine who rented the place and could consent to a search, and she showed it to them. Smith gave oral and written consent to a search, and did not restrict the scope of the search. Unlike McMannis, Smith told the police that Davis stayed in one of the bedrooms occasionally. Smith also indicated to the police that some of Davis's belongings were in one of the rooms. But Smith told the police that the room where the bag was found was a "spare room." Smith did not indicate in any way that anything in the apartment (including the "spare room," which was actually McMannis's room where Davis stayed) was "off limits" to her or to them, even though they specifically asked if anything in the apartment was "off limits" to her. Smith told the police that some of Davis's belongings were in the "spare room," but there is no evidence that Smith told the police that all or even a substantial portion of the items

---

**2.** 495 U.S. 91, 96–97, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

**3.** 146 F.3d 1102 (9th Cir.1998).

in the room were Davis's, or that the bag was Davis's.

In the "spare room," the police found a bag containing a shotgun, which furnished the basis for the felon in possession of a firearm charge for which Davis was convicted. But nothing in the record, nothing whatsoever, establishes factually that the bag was closed, or that there was a lock or even a fastener on the bag, or that the bag was marked with Davis's name, or that Smith told the police that it was Davis's bag.

Thus, nothing supports an inference that the police actually knew or should have known they were invading Davis's privacy when they looked in the bag. What the police "knew" based on Smith's story was that they were looking in a bag in a spare room of Smith's apartment, a room where McMannis and Davis sometimes stayed and in which some of the things (which things were not specified) were Davis's.

Although nothing in the record establishes anything about the bag, Davis's counsel says in his brief that it was closed, black, and under the bed. This is based on an assertion of facts in defense counsel's memorandum of law in the district court, with which government counsel concurred, that the policemen "opened" the bag under the bed. There is nothing asserting whether the flap was merely laying over the top of the contents, or the flap was fastened with the zipper[4] and no evidence suggests that the bag was zipped, fastened, or locked. That it was under the bed and turned out to contain a shotgun might just as reasonably support the infer-

ence that it was open, since that would make emergency access to the shotgun much more convenient.

For all the police knew, they were looking in a bag in which they might expect to find men's or women's hockey equipment, out-of-season ladies' clothes, shoes that McMannis or Smith left bagged to keep the dust bunnies off them, or extra diapers and supplies for McMannis's baby that Smith helped care for. There is no testimony that Smith ever told the police, "That's Davis's bag," or that it was so marked. In short, there is nothing to suggest that the bag presented any objective features that would have identified the bag as belonging to Davis as opposed to Smith or McMannis.

The controlling Supreme Court decision is *United States v. Matlock*.[5] In *Matlock*, the police searched a house pursuant to consent by one of the inhabitants, and found a diaper bag in the closet containing proceeds of a bank robbery. The decision does not say whether the bag was closed. The issue was whether the third party's consent to the search of the bedroom made the diaper bag contents admissible against the bank robber. The answer was "yes," because "the consent of one who possesses common authority over the premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared."[6] *Matlock* uses the common law tort language, though not the tort concept, of "assumption of the risk."[7] The decision expressly rejects application of the law of property as the basis for deter-

---

**4.** In the trial court, defense counsel stated in a memorandum that the bag was an "Easton sports bag." On the internet, these bags are advertised as having zippers, *see* http://www.eastonsports.com (last visited May 29, 2003), but of course a statement in a memorandum combined with an internet search does not add up to a judicially cognizable fact.

**5.** *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

**6.** *Id.* at 170, 94 S.Ct. 988.

**7.** *Id.* at 171, 94 S.Ct. 988.

mining whether consent to a search may be granted. Instead, *Matlock* teaches that the government may show valid consent to search by demonstrating that "permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected."[8] Thus, if persons have "joint access or control for most purposes ... it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."[9] Because the third party's consent was legally sufficient to permit the search of the bag, the Court did not reach the question of whether the officer's reasonable belief as to the consent-giver's authority would have sufficed.

In the case at bar, the district judge denied the motion to suppress based on *Matlock*. In my opinion, he was right. This case is controlled by *Matlock*. *Matlock* does not reach "apparent authority," the theory to which the majority opinion speaks, and the majority, oddly, does not reach "assumption of the risk," the theory to which the Supreme Court speaks in *Matlock*.

There are two Ninth Circuit decisions upon which the majority opinion relies, *United States v. Welch*[10] and *United States v. Fultz*.[11] Both have to be distinguished, to keep Ninth Circuit law in conformity with the Supreme Court decision in *Matlock*.

In *Welch*, two gamblers, a man and a woman, were passing counterfeit $20 bills at a Las Vegas casino. Interrogating them separately, officers obtained the man's consent to search his car. They found a woman's purse, clasped shut, in the trunk, opened it, and a found another $500 in counterfeit twenties. We held that nothing about the woman's purse manifested shared authority with the man to open it up and look inside it, nor did the man have apparent authority to look into her purse.[12] *Welch* has no application to the bag found in Stephanie Smith's "spare room."

A woman's purse is quite obviously a woman's, and the man in *Welch* would not in the ordinary course of things have the woman's consent to root around in it. A man and a woman can be married for decades, with the man not knowing what his wife keeps in her purse, and she not knowing what he keeps in his wallet. No reasonable police officer could assume that a man had shared access inside a woman's purse, unless he told them he did. That is why under *Welch* there is no apparent authority and no manifestation of shared access.

The other Ninth Circuit case upon which the majority relies on *United States v. Fultz*. Following *Welch*, we again held that a third person's consent, such as it was, did not authorize a search of a closed container. In *Fultz*, a woman who had let a man stay in her house consented to a police search of her house, and they found the defendant's contraband in a closed cardboard box in the garage. We noted that there was "no evidence that [the woman] had use of and joint access to or shared control over Fultz's boxes," and that she "told the officers that the boxes and plastic bags that were segregated in one area of the garage were Fultz's and not hers."[13] We rejected the claims of

---

8. *Id.*

9. *Id.* at 171 n. 7, 94 S.Ct. 988.

10. 4 F.3d 761 (9th Cir.1993).

11. 146 F.3d 1102 (9th Cir.1998).

12. *Welch,* 4 F.3d at 764–65.

13. *Fultz,* 146 F.3d at 1106.

authority and apparent authority because the woman "clearly told the officers that Fultz's belongings were exclusively Fultz's and not hers[so that] the officers were fully aware of the actual facts that establish [her] lack of authority to consent to the search of Fultz's closed containers."[14]

The majority claims that the case at bar is materially indistinguishable from *Fultz*.[15] I disagree. In *Fultz*, the consent-giver told the police that "only" the man's things were in that part of the garage, and that the things in the boxes and bags were exclusively his and not the consent-giver's. The police knew they were looking in containers, which we repeatedly emphasized were closed, in a segregated area, containing only someone else's stored possessions, not the consent-giver's. In the case at bar, the area where the bag was left was Stephanie Smith's "spare room," as she told them, and though Davis had "occasionally" stayed there, the police did not know if the bag was Smith's or if it was not. But she nevertheless had access to its contents.

Thus, in *Welch* the police relied on a man's authority to look into a woman's purse, and in *Fultz*, on a homeowner's permission to search a segregated area of her garage even though she expressly identified segregated closed containers as containing someone else's effects and not hers. In the case at bar, they relied on the apartment tenant's authority to search her own "spare room" and whatever things they may find there. *Fultz* is like a hotel allowing the police to open and search guest luggage in the stored baggage room—obviously impermissible. The case at bar is like *Matlock*, the occupant allowing a search of her home including the closets, where the incriminating diaper bag contents were found.

After *Matlock*, this is *a fortiori* a permissible consent-based search. In *Matlock*, at least the police knew that the defendant actually lived in one of the rooms in the house,[16] but here all they knew was that Stephanie Smith lived in the apartment and used this as a "spare room" in which the defendant had occasionally stayed. The issue is not who owns the real estate, or the bag, but whether the reasonable officer would know that he is invading the privacy of someone other than the person who consented.

There is plenty of Ninth Circuit authority upholding the view that searches like the one in the case at bar are within the category of permitted consent searches. In *United States v. Sledge*,[17] a search of an apparently but not actually abandoned apartment with the landlord's consent, we laid down the correct theoretical framework in an opinion by then-Judge Kennedy. *Sledge* holds that the expectation of privacy "should be measured in objective terms."[18] What matters in cases like the one at bar "is not precisely an actual expectation of privacy; [but] rather *the exhibition* of an actual expectation of privacy."[19] In other words, "the defendant must have acted in such a way that it would have been reasonable for him to expect that he would not be observed."[20] Thus, a policeman cannot assume that a hotel clerk has a guest's permission to authorize a search of his effects in his room, but can assume that a landlord has authority to let him search an apparently

---

14. *Id.*

15. Majority at 1170.

16. *Matlock,* 415 U.S. at 166, 94 S.Ct. 988.

17. 650 F.2d 1075 (9th Cir.1981).

18. *Id.* at 1077.

19. *Id.* at 1077 n. 2 (emphasis added).

20. *Id.*

abandoned apartment, because of the different "factually supportable inference of the occupant's probable intent." [21]

Likewise in *United States v. Kim*, we upheld a search of a locked storage unit by consent of a third party. [22] The majority in the case at bar makes no attempt to distinguish or even discuss *Kim*. In *Kim*, one man had rented the locked storage units in which another, the defendant, stored stolen property, and we held that the lessees's consent was good enough, even though he did not have a key and the locks had to be cut off for the police to get in. We explained that under *Matlock* and *Sledge*, " 'assumption of the risk' analysis" applied. [23] By instructing the consent-giver to rent the lockers in his own name and allowing him total control sometimes and partial control all the time over the lockers, the defendant assumed the risk that the consenter would allow access to others. Because such a manifestation gives the third person actual authority, we did not reach the issue of apparent authority to consent to the search. [24]

In the case at bar, as in *Kim*, Davis did not make an objective "exhibition of an actual expectation of privacy." Nor did he act "in such a way that it would have been reasonable for him to expect that he would not be observed" as to the contents of what he left in the room, by Smith or whoever she let in. He "assumed the risk" that Smith would consent to a search, because of her "common authority over the premises or effects," in the room, as in *Kim* and *Sledge*.

Because Davis made no objective manifestation of a reasonable expectation of privacy, the majority errs by analyzing the case in terms of apparent authority. The way the Supreme Court and we have analyzed such "assumption of the risk" cases is by not even reaching apparent authority, because by failing to make an objective manifestation of an expectation of privacy in the goods stored in another's apartment or storage facility, the owner has actually assumed the risk that the third person would look at or permit someone else to look at the goods. For all we know, on this sparse record, Davis carefully and purposely *avoided* making an objective manifestation of an expectation of privacy in the contents of the bag, in contrast to a hotel guest putting his name on stored luggage, because he knew that by storing a firearm in the bag that was marked clearly as his, he would be admitting to commission of a felony. One storing contraband might purposely *avoid* objective manifestations of dominion to protect himself.

The lies by Jessica McMannis and Stephanie Smith make the case for allowing the search even more compelling under our precedents. Under *United States v. Fiorillo*, where the officer reasonably believes the consent-giver's lie (or omission of a fact), which, if true, would provide the consent-giver with actual authority, we allow the search under the notion of "apparent authority." [25]

Thus, the majority is not merely following or applying our holding in *Fultz*, be-

**21.** *Id.* at 1077.

**22.** 105 F.3d 1579 (9th Cir.1997).

**23.** *See id.* at 1582.

**24.** *Id.* at 1583.

**25.** 186 F.3d 1136, 1144 (9th Cir.1999). Using "apparent authority" in this way is a stretch in terms of agency law, because only a principal can cloak an agent with "apparent authority." A person cannot by a lie cloak himself in such authority, but as with property law, the technicalities of agency law do not control resolution of the Fourth Amendment criminal issue.

cause the goods in *Fultz* were segregated and expressly identified to the officers as another person's, not the consent-giver's. Given the materially different facts here, the majority is extending *Fultz*. That might be permissible, were it not for *Matlock*. We have to follow the Supreme Court decision in *Matlock*. *Fultz* cannot be extended to searches of bags in an apartment to which consent has been given to search by a person with access to the whole apartment, where the bags have *not* been expressly identified as someone else's goods, without conflicting with *Matlock*. *Matlock* limits the extension of *Fultz*. This case passes the limit.