**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE GRAND JURY SUBPOENA,
JK-15-029,

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

JOHN A. KITZHABER,
*Intervenor-Appellant.*

No. 15-35434

D.C. No.
3:15-mc-00129-HZ

OPINION

Appeal from the United States District Court
for the District of Oregon
Marco A. Hernandez, District Judge, Presiding

Argued and Submitted November 2, 2015
Portland, Oregon

Filed July 13, 2016

Before: Raymond C. Fisher, Marsha S. Berzon,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Berzon

# SUMMARY[*]

## Grand Jury Subpoena

The panel reversed the district court's order declining to quash a grand jury subpoena seeking a broad range of information from the State of Oregon as part of a federal investigation into activities of former Governor John Kitzhaber, and remanded.

For several years before Kitzhaber left office, copies of his personal emails were archived on Oregon's computer servers. The panel agreed with Kitzhaber, an intervenor, that he had a reasonable expectation of privacy in much of his personal email (although the Fourth Amendment's protection does not extend to any use of a personal email account to conduct public business), and that the subpoena in this case — which is not even minimally tailored to the government's investigatory goals – is unreasonable and invalid. The panel held that Kitzhaber may not assert the attorney-client privilege for his communications, including communications regarding potential conflicts of interest and ethics violations, with the State of Oregon's attorneys. The panel explained that whatever privilege may protect those communications belongs to the State of Oregon, not to Kitzhaber as an individual officeholder in his personal capacity.

The panel remanded with instructions to quash the present subpoena in its entirety. The panel declined to address in the first instance issues likely to arise concerning the means of

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

segregating and producing the material requested by a subpoena tailored in accordance with this opinion.

## COUNSEL

Janet Lee Hoffman (argued) and Jennifer E. Roberts, Janet Hoffman & Associates LLC, Portland, Oregon, for Intervenor-Appellant.

Kelly A. Zusman (argued) and Scott Bradford, Assistant United States Attorneys; Billy J. Williams, United States Attorney; United States Attorney's Office, Portland, Oregon; for Plaintiff-Appellee.

## OPINION

BERZON, Circuit Judge:

This case arises in the midst of an investigation by the federal government into activities of the former Governor of Oregon, John Kitzhaber. A grand jury's subpoena seeks a broad range of information from the State of Oregon, much of which would be available to the general public under Oregon's public records laws. But a wide net is susceptible to snags.

For several years before Kitzhaber left office, copies of his personal emails were archived on Oregon's computer servers. According to Kitzhaber, he was unaware of the archiving of these emails, which include many private details unrelated to his official duties regarding him and his family, as well as private communications with his personal attorneys

and with attorneys for the State of Oregon. Because this cache would be turned over to the government under the subpoena, Kitzhaber argues the subpoena is unreasonably broad, as it violates his Fourth Amendment privacy rights and invades his attorney-client privilege. Kitzhaber asserts in particular that the attorney-client privilege protects his communication with attorneys for the State of Oregon regarding issues concerning possible conflicts of interest and ethics violations. The government disclaims any interest in Kitzhaber's communications with his personal attorneys but argues it is otherwise entitled to everything it has requested.

The public's interest in accountability and transparency is particularly strong when it comes to the investigation of elected officials, and grand juries are appropriately accorded a wide degree of latitude. But we agree with Kitzhaber that he had a reasonable expectation of privacy in much of his personal email (although the Fourth Amendment's protection does not extend to any use of a personal email account to conduct public business), and that the subpoena in this case — which is not even minimally tailored to the government's investigatory goals — is unreasonable and invalid. We do not agree, however, that Kitzhaber may assert the attorney-client privilege for his communications, including communications regarding potential conflicts of interest and ethics violations, with the State of Oregon's attorneys. Whatever privilege may protect those communications belongs to the State of Oregon, not to Kitzhaber as an individual officeholder in his personal capacity.

I

John Kitzhaber served as Governor of Oregon from 1995 until 2003, and again from 2011 until 2015. During this

second period in office, Kitzhaber declined to use an official email address provided by the State of Oregon. Instead, he established an account with the commercial email service Gmail, which he used for official business. He requested that the Oregon Department of Administrative Services (DAS) archive on the state's servers emails sent to or from this "official" Gmail address, and DAS complied.

In addition to his official Gmail account, Kitzhaber had a personal Gmail account and another personal account hosted at att.net. He checked all of these accounts from the same computer. According to a member of the Governor's senior staff, Kitzhaber commonly used his personal addresses "to communicate with senior staff for both personal and state business."

In February of 2015, Kitzhaber resigned from office, surrounded by controversy over whether he had used his position to benefit his fiancée, Cylvia Hayes. *See* Lee van der Voo and Kirk Johnson, *Governor Leaves Office in Oregon, Besieged in Crisis*, N.Y. Times, Feb. 14, 2015, at A1, http://www.nytimes.com/2015/02/14/us/kitzhaber-resigns-as-governor-of-oregon.html. Shortly before Kitzhaber's resignation, a federal grand jury issued a subpoena to DAS as part of an investigation into the Governor's actions. The subpoena asked DAS to provide "all information, records, and documents" going back to January 1, 2009, "relating to" Kitzhaber, Hayes, and several businesses and other entities. The subpoena also sought "any and all email communications from or to, or regarding" seventeen individuals, including Kitzhaber and Hayes.

After he left office, Kitzhaber intervened in the grand jury proceedings, filing a motion to quash the subpoena in the

United States District Court for the District of Oregon. According to Kitzhaber, shortly before resigning he discovered that DAS had been archiving emails to and from his personal email accounts on state servers. Kitzhaber asserted that DAS was not authorized to archive his emails from his personal addresses, which he says contain a great deal of private communication, including privileged communication with his personal attorneys. He challenged the subpoena on the grounds that it was unreasonably broad; a violation of his Fourth Amendment rights; and a violation of attorney-client privilege.

The district court ruled that Kitzhaber's communication with his private attorneys over his personal email addresses was protected by the attorney-client privilege and should not be disclosed to the grand jury. The court directed the government to create a "taint/filter team" to segregate the protected emails from the remaining content generated in response to the subpoena and prevent the protected content from reaching the jury. It ruled against Kitzhaber on every other issue. The court held that third parties to a subpoena, like Kitzhaber here, may not challenge the burden of production required to comply with the subpoena. It also held that any potential Fourth Amendment violation could be raised only in a suppression motion filed if Kitzhaber ends up being indicted and brought to trial. And it held that the attorney-client privilege did not apply to Kitzhaber's communication with government attorneys. The court therefore declined to quash the subpoena. Kitzhaber timely appealed.

II

Kitzhaber argues that the district court should have quashed the subpoena in its entirety. We agree.

The subpoena includes emails on his personal accounts that Kitzhaber reasonably expects to remain private, as they do not concern public business. (Like the district court, we proceed on the assumption that Kitzhaber did not authorize DAS to archive the emails from his personal accounts). The subpoena does not exclude these communications or otherwise limit the documents demanded to those within the scope of the government's legitimate concern in conducting a thorough investigation of Kitzhaber's conduct of official business. As a result, the subpoena is unreasonably overbroad — analogous, that is, to a general warrant, which constitutes an unreasonable search under the Fourth Amendment. *See United States v. Bridges*, 344 F.3d 1010, 1016 (9th Cir. 2003). As such, the subpoena, as drafted, may not be enforced.

A. "The grand jury is, to a degree, an entity independent of the courts, and both the authority and the obligation of the courts to control its processes are limited." *In re Grand Jury Investigation of Hugle*, 754 F.2d 863, 864 (9th Cir. 1985). But the normal rule of noninterference is "not absolute." *Id.* A subpoena is not automatically valid "merely because the Constitution does not prohibit it and the material [it seeks] is not privileged." *United States v. Bergeson*, 425 F.3d 1221, 1226 (9th Cir. 2005). Rather, courts may "exercise supervisory power over the grand jury where there is a clear potential for a violation of the rights either of a witness or of a nonwitness, if the violation cannot be corrected at a later stage." *Hugle*, 754 F.2d at 864.

Here, there is a clear potential for the violation of Kitzhaber's rights. "[A]n order for the production of books and papers may constitute an unreasonable search and seizure within the 4th Amendment." *Hale v. Henkel*, 201 U.S. 43, 76 (1906), *abrogated in part on other grounds by Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 68 (1964). This can be true "whether under a search warrant or a *subpoena duces tecum*." *Id.*[1] When the government crafts subpoenas, it must "make a reasonable effort to request only those documents that are relevant and non-privileged, consistent with the extent of its knowledge about the matter under investigation." *In re Horn*, 976 F.2d 1314, 1318 (9th Cir. 1992). A subpoena without such tailoring is "equally indefensible as a search warrant would be if couched in similar terms." *Hale*, 201 U.S. at 77. Thus, where a grand jury's subpoena, given its overbreadth, would *itself* violate the privacy interests protected by the Fourth Amendment, "[j]udicial supervision is properly exercised in such cases to prevent the wrong before it occurs."[2]  *United States v. Calandra*, 414 U.S. 338, 346 (1974).

---

[1] Recently, the Supreme Court implicitly reaffirmed that subpoenas trigger Fourth Amendment concerns and may be challenged on Fourth Amendment grounds. *City of Los Angeles, Cal. v. Patel*, 135 S. Ct. 2443, 2453 (2015). *Patel* did not directly involve a challenge to a subpoena. But it did indicate that a subpoena recipient's ability to "move to quash [a] subpoena before any search takes place" is sufficient to protect his or her Fourth Amendment rights. *Id.*

[2] In contrast, a witness may not refuse to answer questions before a grand jury on the grounds that they are based on evidence previously improperly seized. *Calandra*, 414 U.S. at 351–53. But in that circumstance, the wrong has already been "fully accomplished" by the time the witness is called to testify; the exclusionary rule can be invoked if such evidence is introduced at trial, but is inapplicable in grand jury proceedings. *Id.* at 349–54.

B.  The district court concluded otherwise.  It was of the view that it was obliged to enforce the subpoena as long as there was a "reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation," citing *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991).  Not so.

*R. Enterprises* held that where "a subpoena is challenged on relevancy grounds, the motion to quash must be denied unless the district court determines that there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation."  498 U.S. at 301.  But *R. Enterprises* does not suggest that by self-defining the "category of materials" sought as broadly as possible, the government insulates its subpoenas from review.  Otherwise, when the government seeks all material of a broad generic type that a party possesses — every piece of paper in a corporation's files, for example, or, as in this case, all of an individual's emails over a several year period — a reasonable possibility that *some* of that material would be relevant would suffice to validate the subpoena, no matter how vast its sweep, and no matter the degree to which the subpoena would reach private material of no pertinence to the grand jury's inquiry.

The reference to "category of materials" in *R. Enterprises* confirms that subpoenas typically designate for production a discrete "category" of materials. Where one does not, and there is a broad, identifiable "category of materials the Government seeks [that] will [not] produce information relevant to the general subject of the grand jury's investigation," *id.* — here, for example, material about

Governor Kitzhaber's children or medical care — the subpoena is unreasonably broad.

Our decisions in *In re Horn*, 976 F.2d 1314 (9th Cir. 1992), and *United States v. Bergeson*, 425 F.3d 1221 (9th Cir. 2005), confirm this understanding of *R. Enterprises*. They make clear that a subpoena may be quashed when no effort is made to tailor the request to the investigation, even if some fraction of the material the subpoena seeks is relevant. *See Bergeson*, 425 F.3d at 1225–26; *Horn*, 976 F.2d at 1318–19.

The government's subpoena in this case is much broader than the subpoena we rejected in *Horn*. In *Horn*, the subpoena at issue sought all information regarding the financial transactions of a lawyer's clients. 976 F.2d at 1319. Here, there is no subject matter limitation whatsoever on the documents sought. The subpoena seeks, among other things, all of Kitzhaber's e-mail communication over several years, with no limitation on the content, senders, or recipients of the e-mails. As Kitzhaber points out, the subpoena would net, for instance, "emails between [himself] and his son's physicians or teachers."

Notably, the government attached to the subpoena a non-exhaustive list of the kinds of documents that might be included in the data it sought. But the subpoena explicitly did not limit itself to that material, so that list did not narrow the scope of the subpoena itself. At the same time, by indicating the government's particular investigatory goals, the list confirms that a narrowing of the subpoena in accord with that list would not compromise the investigation.

Because the government did not in any manner tailor its request to relevant material, the subpoena was unreasonably

broad and within the district court's supervisory power, and responsibility, to quash.[3]

C. This conclusion is reinforced by the nature of the emails caught up in the exceedingly broad subpoena. Stored in his personal accounts, many of the messages — or so Kitzhaber avers — do not concern official state business in any way, and some concern particularly private matters, including communications about medical issues and Kitzhaber's children.

The combination of the subpoena's vast overbreadth and inclusion of messages as to which Kitzhaber has a reasonable expectation of privacy implicates privacy interests similar to those triggered by the issuance of a general warrant. As currently framed, the subpoena will, if complied with, allow federal government agents seeking out the messages that bear relevance to their investigation to peruse all manner of private communications that do not. *See generally United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010) (en banc).

We have previously held that email should be treated like physical mail for purposes of determining whether an individual has a reasonable expectation of privacy in its content. *United States v. Forrester*, 512 F.3d 500, 511 (9th

---

[3] Kitzhaber also argues the subpoena should be quashed as unreasonable under Federal Rule of Criminal Procedure 17(c)(2), which states that "[o]n motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive." It is not immediately clear from Rule 17(c)(2)'s text whether it can be invoked by an intervening third party to quash a subpoena. We need not reach the issue of Rule 17(c)(2)'s applicability here, as we hold that the subpoena should here be quashed under the district court's general supervisory power.

Cir. 2008). While an email's addressing information is visible to third parties and therefore not protected, emails also contain "content that the sender presumes will be read only by the intended recipient." *Id.*

We have also noted that electronic storage devices such as laptops "contain the most intimate details of our lives: financial records, confidential business documents, medical records and private emails," and held that "[t]hese records are expected to be kept private and this expectation is one that society is prepared to recognize as reasonable." *United States v. Cotterman*, 709 F.3d 952, 964 (9th Cir. 2013) (citation omitted). The Supreme Court, too, has emphasized recently the ability of digital troves to contain "[t]he sum of an individual's private life," and the corresponding need for our jurisprudence to reflect the changing technological landscape. *Riley v. California*, 134 S. Ct. 2473, 2489 (2014). Personal email can, and often does, contain all the information once found in the "papers and effects" mentioned explicitly in the Fourth Amendment. Kitzhaber thus has a strong claim to a legitimate expectation of privacy in his personal email, given the private information it likely contains.

DAS's current possession of the emails does not vitiate that claim. "[T]he Fourth Amendment protects people, not places." *United States v. Davis*, 332 F.3d 1163, 1167 (9th Cir. 2003) (citation omitted). Kitzhaber's interests therefore attach to "the thing[s] seized," not merely to the place where they are located. *Id.* As we held in *Forrester*, emails are to be treated as closed, addressed packages for expectation-of-privacy purposes. 512 F.3d at 511. And a person "does not forfeit [his] expectation of privacy merely because [a private] container is located in a place that is not controlled exclusively by the container's owner." *United States v.*

*Monghur*, 588 F.3d 975, 978 (9th Cir. 2009) (citation omitted).**[4]**

The Fourth Amendment bars searches of closed containers even if they are not in their owners' possession. *Davis*, 332 F.3d at 1167; *United States v. Fultz*, 146 F.3d 1102, 1105 (9th Cir. 1998). Where a third party comes into possession of a closed container accidentally, the Fourth Amendment bars the government from examining the contents of the container beyond "the extent that [it] had already been examined by third parties." *Walter v. United States*, 447 U.S. 649, 656 (1980) (plurality opinion).**[5]** Kitzhaber asserts, and the government does not dispute, that he and DAS came to an agreement that his personal email accounts would be segregated on Oregon's servers and not distributed "without a court order or other legal process." There is no evidence in the record, and no assertion made by the government, that DAS or anyone else has opened or examined the contents of the email on Kitzhaber's personal accounts. Kitzhaber's claim to a reasonable expectation of

---

**[4]** It is true that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Forrester*, 512 F.3d at 509 (quoting *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979)). In this circumstance, however, we are assuming, as did the district court, that, as he maintains, Kitzhaber did not mean to turn his private email over to DAS.

**[5]** *United States v. Joseph* distinguished *Walter* and held that "[f]ederal examination of evidence in the state's possession does not constitute an independent search requiring the execution of a search warrant." 829 F.2d 724, 728 (9th Cir. 1987). But *Joseph* "stress[ed] that the records were seized by the DA's office pursuant to a valid search warrant." *Id.* at 726. Here, in contrast, no warrant supported the initial archiving of the email. *Walter*, which dealt with mail accidentally delivered to a third party, is the more apposite case. *See* 447 U.S. at 651.

privacy in the contents of the emails is therefore not undermined by Oregon's possession of the emails.

Kitzhaber's privacy claim lacks force, however, with respect to any emails transmitted through his personal email accounts but concerning official business. Oregon's public records law, O.R.S. § 192.410 *et seq.*, which applies to "every state officer," grants a general right to the public to inspect "any writing that contains information relating to the conduct of the public's business." §§ 192.410, 192.420. Kitzhaber has acknowledged that he instructed DAS to archive emails in his "official" Gmail account to comply with public records laws. The government has also offered evidence that the State of Oregon's training for employees informs them that emails on personal accounts regarding state business are not exempt from public records laws.

Consequently, whether or not Kitzhaber had a subjective expectation of privacy as to emails on his private accounts relating to official business, any such expectation is not a reasonable one. "[C]ompliance with state open records laws . . . bear[s] on the legitimacy of a[] [public] employee's privacy expectation." *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 758 (2010). While the existence of an open records law may not be conclusive in all cases, it is conclusive here. The public interest in open and transparent governance is at its zenith when it comes to the state's top elected official and his communication with senior advisers regarding official business. Even if state officials expect to evade those laws through the use of personal email addresses, that expectation is not a protected privacy interest.

Kitzhaber therefore had a reasonable expectation of privacy regarding emails on his personal accounts unrelated

to official business.  Because the subpoena was in no way tailored to the investigations being conducted, it included those purely private emails.  Again, the district court had the supervisory power, and responsibility, to quash the vastly overbroad subpoena, and thereby prevent the trampling of Kitzhaber's reasonable expectation of privacy.

### III

Kitzhaber also challenges the subpoena as violating attorney-client privilege.  He claims the privilege protects both his communications with his personal attorneys *and* specific communications with government attorneys regarding potential conflicts of interest.

Kitzhaber is correct, and the government does not dispute, that his communication with privately-retained attorneys is protected by the attorney-client privilege and should not be turned over to the grand jury.  *See, e.g.*, *Horn*, 976 F.2d at 1318–19.   But, for several reasons, we conclude that Kitzhaber may not invoke the attorney-client privilege for his communications with government attorneys regarding conflicts of interests or ethics violations.  Whatever privilege such communications may implicate is held by the State of Oregon, not Kitzhaber personally.

First, Kitzhaber maintains that the privilege over the conflict of interest and ethical obligations conversations should attach to him personally, because any liability resulting from breaking those obligations would be personal. The potential for personal liability, Kitzhaber maintains, should have indicated to the government attorneys he consulted that he was seeking personal legal advice.  Also, because of the potential for personal liability, Kitzhaber

argues, he himself had a reasonable expectation that his conversation with government attorneys would be protected by the attorney-client privilege.

Much uncertainty surrounds the reach of the attorney-client privilege in the context of investigations into public officials. *See, e.g.*, *In re Grand Jury Investigation*, 399 F.3d 527 (2d Cir. 2005); *In re Witness Before the Special Grand Jury 2000-2*, 288 F.3d 289 (7th Cir. 2002); *In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998); *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910 (8th Cir. 1997). That uncertainty, however, has concerned cases in which an attorney-client privilege with a government lawyer was invoked by a governmental entity, or by an individual in his or her official capacity. Where courts have acknowledged the attorney-client privilege to apply to conversations between government officials and government lawyers, they have construed the privilege to mean that "*the Government* may invoke the attorney-client privilege," not that officeholders in their personal capacity may invoke the privilege. *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 170 (2011) (emphasis added); *see also In re Grand Jury Investigation*, 399 F.3d at 534–35 & n.3. In no instance, as far as we are aware, has a former officeholder successfully claimed that a government staff lawyer discussing a matter relating to official business was representing the officeholder personally during a conversation had while both were government employees.[6]

---

[6] A different scenario arises when a government attorney is provided by the government specifically for the purpose of representing a public employee sued in her personal capacity. *See, e.g.*, Restatement (Third) of the Law Governing Lawyers § 74 cmt. d (Am. Law Inst. 2000). In that situation, where "government attorneys stand in the shoes of private

Moreover, a consultation concerning conflict-of-interest or ethics laws *is* a consultation about an office holder's *official* actions and obligations. For example, when a judge considers whether a statute or code of conduct requires that she recuse from a case because of personal financial interests or the involvement of a relative or friend, what is at stake is precisely how she is to carry out judicial obligations. Similarly, an executive officer who consults with a government attorney concerning whether to let a certain contract go to a person with whom he has business dealings, or to a relative, is seeking advice about carrying out his official duties.

Consideration of the possible personal sanctions for non-compliance with such legal obligations is likely to be an integral part of such discussions; sanctions are imposed precisely to induce compliance. But that does not mean that during those conversations, the government lawyers are acting as the personal attorneys for the officeholders. Government lawyers, like the elected officials they assist, are public servants, and their client is the government, not officeholders in their personal capacities. "[G]overnment lawyers have responsibilities and obligations different from those facing members of the private bar. While the latter are appropriately concerned first and foremost with protecting their clients . . . government lawyers have a higher, competing duty to act in the public interest." *In re Special Grand Jury*, 288 F.3d at 293. The public interest may well include advising government officials about their ethical

counsel," *In re Lindsey*, 158 F.3d at 1269, whether and when the government employee may invoke the privilege in their individual capacity may require a different analysis. We express no view of that scenario here.

duties; that the public's interest partially overlaps with those officials' private interests does not convert government attorneys into those officials' private attorneys.

Kitzhaber maintains, however, that officeholders will "be less likely to engage in full and frank discussions with agency counsel about the facts underlying a potential conflict" if the privilege does not attach to officeholders in their personal capacity. Perhaps so. But the State of Oregon has an exceedingly strong interest in keeping conversations concerning conflicts of interests between its lawyers and other officials confidential to ensure candor, and therefore in invoking the attorney-client privilege as to such conversations.[7]

Further, Kitzhaber could have hired his own lawyer for consultation about his conflict-of-interest concerns, and indeed did hire his own lawyer to represent him in an ethics inquiry. Generally, "[a]n official who fears he or she may have violated the criminal law and wishes to speak with an attorney in confidence should speak with a private attorney, not a government attorney." *In re Grand Jury Subpoena*

---

[7] In a letter submitted after oral argument in this case, the State informed us that it has asserted and continues to assert the attorney-client privilege in the U.S. Attorney's investigation. Where government officials assert the attorney-client privilege during criminal investigations into government misconduct, the scope of the privilege is not clearly established. *See In re Grand Jury Investigation*, 399 F.3d 527 (2d Cir. 2005); *In re Witness Before the Special Grand Jury 2000-2*, 288 F.3d 289 (7th Cir. 2002); *In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998); *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910 (8th Cir. 1997). We express no opinion on the proper scope of Oregon's asserted privilege in this decision, as the State of Oregon is not a party before us and Kitzhaber may not invoke the privilege in his personal capacity.

*Duces Tecum*, 112 F.3d at 921. As to any communications with a private lawyer, Kitzhaber must "receive[] the full protection of the attorney-client and work product privileges in his dealings with personal counsel." *In re Lindsey*, 158 F.3d at 1278.

We are thus unpersuaded by Kitzhaber's arguments that his conversations with state attorneys regarding state conflict-of-interest laws are protected by a privilege that he may assert in his personal capacity. Kitzhaber's communication with his private attorneys should receive all the protections normally afforded by the attorney-client privilege. But he may not himself invoke the privilege to protect his communication with attorneys for the State of Oregon.

IV

The parties dispute the proper procedure for assuring compliance with any limitations on production of documents. In the district court, Kitzhaber argued that his lawyers should be able to review his personal emails before they are released to the government, to determine which were protected by the attorney-client privilege. The government asked the district court to review Kitzhaber's emails *in camera*. The district court took a third course — it held that the documents should be turned over to the government's "taint/filter team" under a standard protocol designed to remove any privileged communication before passing the non-protected information along to the prosecutorial team.

The district court considered these possible procedures in the context of the very narrow limitation on production it recognized — that communications between Kitzhaber and his private attorneys, but no others, were exempt from

production.  But we are remanding with instructions to quash the government's present subpoena in its entirety.  As a result, no filtering issues will immediately arise. We therefore do not address whether the district court's adoption of the "taint/filter" team protocol was appropriate for the limited purpose for which it was imposed.

We fully expect the government will issue a subpoena tailored in accord with this opinion.  If so, issues are likely to arise concerning the means of segregating and producing the material requested by such a proper subpoena.  But the parties, and the district court, have had no opportunity to address the appropriate segregating mechanism for a properly drawn subpoena.  We will not do so in the first instance.

Given the parties' expressed views, however, a few comments are in order.  With a substantively tailored subpoena, the problem of separating the messages covered by the subpoena from those not covered becomes much more complex than the limited segregation issue addressed by the district court.  It will not be enough simply to look at the sender or recipient of Kitzhaber's emails to determine whether they possibly deal with the subjects covered by the subpoena.  Instead, whoever is doing the sorting will have to look at and consider in detail the content of the emails.

The situation will be further complicated by the fact that the documents are in the possession of a third party, the State of Oregon. Kitzhaber objects to Oregon, another government entity, combing through his private emails.  And the state undoubtedly would prefer not to do so because of the burden imposed.  Yet, because Oregon possesses the emails, the usual process, in which the person to whom a subpoena is directed and his attorney sort through the documents and

produce those called for, has no direct application. Without limiting the possible procedures for segregating the documents to be produced, we note that one option, not mentioned by the parties, would be engaging a neutral third party to sort Kitzhaber's emails. *See Comprehensive Drug Testing*, 621 F.3d at 1179 (Kozinski, J., concurring).

**REVERSED** and **REMANDED** for further proceedings consistent with this opinion.