2024 IL App (1st) 232333

Nos. 1-23-2333, 1-23-2334 (cons.)

SECOND DIVISION
June 28, 2024

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) Appeal from the Circuit Court of Cook County, Criminal Division |
| Plaintiff-Appellant, | ) ) |
| vs. | ) ) ) Case Nos. 22 CR 1350201, 22 CR 1356801 |
| NICHOLAS TRUTENKO and T. ANDREW HORVAT, | ) ) ) Honorable Daniel B. Shanes |
| Defendants-Appellees. | ) ) ) Appeal from Order of November 8, 2023 pursuant to Supreme Court Rule 604 |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Mikva concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Nicholas Trutenko stands charged with official misconduct, obstruction of justice, and perjury allegedly committed while he was an assistant state's attorneys (ASA), specifically in regard to the multiple prosecutions of Jackie Wilson, both the second Wilson trial in 1989 (when Trutenko was the prosecutor) and the third in 2020 (when he was an ASA, but the case was tried by a special prosecutor). The State alleges that Trutenko committed various criminal acts in relation to both Wilson trials, including—relevant here—withholding exculpatory evidence.

¶ 2    In this case, also tried by the Office of Special Prosecutor (OSP), the State seeks to prove Trutenko's culpability for withholding material exculpatory evidence, in large part during

conversations Trutenko had with a fellow ASA, Paul Fangman, in September 2020, as the third Wilson trial approached, and both Trutenko and his employer, the Cook County State's Attorney's Office (CCSAO), were issued subpoenas by Jackie Wilson's defense attorneys. Those defense lawyers made no secret that the purpose of these subpoenas was to uncover material information from, if not misconduct by, Trutenko in his role as an ASA. The State seeks to introduce evidence of multiple conversations between Fangman and Trutenko in which Trutenko allegedly withheld material exculpatory information relating to the Wilson trial from Fangman, despite Fangman's prompting.

¶ 3    In the midst of his bench trial here with co-defendant T. Andrew Horvat (another ASA whose involvement we will discuss later), defendant Trutenko claimed, for the first time, that his communications in September 2020 with his fellow ASA Fangman were protected by the attorney-client privilege. After pausing the trial to conduct an evidentiary hearing, the trial court agreed that the proffered communications were privileged, and it further ruled that they were inadmissible on evidentiary grounds that Trutenko had not raised. The State seeks interlocutory review of these rulings.

¶ 4    We hold that Fangman and Trutenko, fellow ASAs at all relevant times, were not attorney and client. Fangman handled at least one, and arguably two, subpoenas issued by defense attorneys for Jackie Wilson in September 2020. Because the subpoenas sought Trutenko's personnel file and his testimony at Wilson's upcoming trial, Fangman no doubt had to confer with Trutenko. But his true client was the CCSAO; if Fangman represented Trutenko at all, it was only in Trutenko's official capacity. Which means that the attorney-client privilege

belongs to the CCSAO, not Trutenko. And the CCSAO has affirmatively waived any privilege that it may have been able to assert in a criminal probe of one of its own agents.

¶ 5    This is not a contingent, fact-bound conclusion, rooted in the particular relationship between Fangman and Trutenko. It is a matter of statutory law: as an ASA, Fangman could *only* represent his fellow ASA Trutenko in his official capacity; he could not serve as Trutenko's personal lawyer. See 55 ILCS 5/3-9005(a)(4) (West 2022). And it is equally a matter of fundamental principle: a government lawyer's duty is to serve the public's interests, including its compelling interest in exposing official wrongdoing. A public official may not use a government lawyer to shield evidence of his alleged wrongdoing in office from the People themselves, as represented by the criminal process. Trutenko has no attorney-client privilege to assert.

¶ 6    Nor can we agree with the trial court's backup bases for its exclusion of this evidence. The hearsay rule is not implicated here in any meaningful way, certainly not in any sweeping fashion as the trial court applied it, and the court's rulings on relevance and cumulativeness fail to acknowledge the unique probative value of Fangman's testimony for the State's burden to prove the materiality and *mens rea* elements of the charged offenses.

¶ 7    We reverse the trial court's order and remand for further proceedings.

¶ 8                              BACKGROUND

¶ 9                                    I

¶ 10   Trutenko's role in the prosecution of Jackie Wilson is essential context for understanding the purported attorney-client relationship between Trutenko and Fangman and the relevance of their communications to the State's proof of certain offense elements. So we begin with a brief,

bird's-eye sketch of this long and often regrettable chapter of local legal history.

¶ 11    Chicago police officers Richard O'Brien and William Fahey were murdered in 1982. The Wilson brothers, Jackie and Andrew, were jointly tried and convicted of these infamous crimes. Each conviction was reversed. *People v. Andrew Wilson*, 116 Ill. 2d 29 (1987); *People v. Jackie Wilson*, 161 Ill. App. 3d 995 (1987). Andrew's confession was suppressed as the product of police torture, thus marking the beginning of what we have come to call the Burge scandal. But not Jackie's confession. At least not yet.

¶ 12    Jackie—whom we will simply call "Wilson" from now on, as Andrew's relevance to our story has more or less been exhausted—was re-tried in 1989. This time around, defendant Trutenko was the lead prosecutor. He offered a new witness, a jailhouse informant and notorious con artist named William Coleman, who testified, in sum, that Wilson made incriminating statements to him while they were housed together in the Cook County jail. In exchange for that testimony, Trutenko helped broker plea deals on Coleman's pending state and federal charges. These extraordinary deals allowed Coleman to serve only a few months in prison, far short of the decades he potentially faced on a host of charges. The full benefits of the State deal were not disclosed to Wilson, and the federal deal was not disclosed at all. Wilson was again convicted of Officer O'Brien's murder, but he was acquitted of Officer Fahey's murder.

¶ 13    Coleman returned to his native England in 1989, after serving his minimal sentences. In 1991, Trutenko left the CCSAO for private practice. He would return in 2008.

¶ 14    Meanwhile, Wilson's case, like so many others, wound its way through postconviction proceedings and, eventually, a hearing before the Illinois Torture Inquiry and Relief Commission

(TIRC). The TIRC found credible evidence that Wilson's confession was the product of police torture. On this basis, Wilson's conviction was overturned again in 2018, and his confession was suppressed. *People v. Wilson*, 2019 IL App (1st) 181486. Given the CCSAO's standing conflict in the Burge torture cases, the OSP was appointed to handle the Wilson prosecution, and it decided to try him a third time. That trial was held in 2020.

¶ 15                                    II

¶ 16    With Wilson's confession now suppressed, the jailhouse informant Coleman's testimony took on heightened significance, now arguably the centerpiece of the State's case. But there was a wrinkle: nobody could find him, despite an exhaustive international search. A "peripatetic felon," with a far-flung reputation as a " 'consummate liar,' " a transnational rap sheet of fraud convictions (and some violent crimes, too), and the wherewithal to evade a longstanding INTERPOL arrest warrant, Coleman proved so elusive that he was eventually presumed dead. *Wilson v. City of Chicago*, 6 F.3d 1233, 1239 (7th Cir. 1993). The circuit court deemed Coleman unavailable. Over defense objection, his prior testimony would be read into the record at Wilson's third trial.

¶ 17    By now, Wilson's attorneys had discovered Coleman's plea deals. And they had reason to believe that Trutenko and Coleman developed a relationship that persisted for some unknown amount of time after Wilson's second trial. But with Coleman absent, there would be no cross-examination in which to probe the credibility of the State's star witness with this new information. So Trutenko himself became the focal point of the credibility attack.

¶ 18    To this end, Wilson's attorneys issued several subpoenas, but two of particular interest.

The first was a document subpoena to the CCSAO, seeking Trutenko's personnel file. The second was a witness subpoena for Trutenko's testimony at Wilson's upcoming third trial.

¶ 19   As Wilson's attorneys explained to Fangman and to Judge Hooks, who presided over the Wilson case, the defense believed that the documents it sought were exculpatory, insofar as they would cast doubt on the propriety of Trutenko's dealings with Coleman and thus, by extension, undermine the credibility of Coleman's prior testimony. The CCSAO was granted intervenor status in the Wilson case.

¶ 20   These subpoenas provide the context for the conversations, e-mails, and court appearances from which the purported attorney-client relationship between Trutenko and Fangman is said to have arisen. We will circle back to the particulars, but for immediate purposes, a general sketch of the context will suffice. Upon receiving the document subpoena, the CCSAO assigned it to Fangman. A few days later, Trutenko was served with the witness subpoena. That subpoena was not immediately assigned an ASA; nine days after Trutenko received it, it was assigned to codefendant Horvat, another ASA.

¶ 21   Fangman conferred with Trutenko as he prepared the CCSAO's response to the document subpoena. And while the witness subpoena remained unassigned, Fangman spoke to Trutenko about that subpoena, too; he also participated, to some extent, in a witness-prep session before Trutenko took the stand. At the heart of the trial court's finding of privilege is this thought: in stepping into the breach on the witness subpoena, Fangman inadvertently created an attorney-client relationship with Trutenko.

¶ 22   As Trutenko's day on the stand approached, he participated in a Zoom prep session with

Fangman, Horvat, and Lawrence Rosen, one of the special prosecutors trying the Wilson case. The primary topic of conversation, according to the State, was Coleman, since that is why Wilson's attorneys were calling Trutenko in the first place.

¶ 23    Trutenko testified in the Wilson trial a few days later. As he took the stand, according to the State, Horvat approached Rosen and requested that he refrain from asking Trutenko any questions about Coleman. But on direct (if hostile) examination by the defense, Trutenko revealed, for the first time, that he had a decades-long personal relationship with Coleman. For example, he had flown to England in 1992 to become the godfather of Coleman's daughter. More importantly—given that Coleman was presumed dead and had thus been deemed unavailable—Trutenko knew full well that Coleman was alive. In fact, they were still in touch, at least from time to time, and Trutenko had received an e-mail from Coleman just a few days earlier.

¶ 24    As the State views it, Trutenko had failed to disclose his relationship with Coleman, and he had withheld information about Coleman's whereabouts from the defense, the OSP, the circuit court, and his own chain of command within the CCSAO. This despite the fact that he knew—through his communications with Fangman—that Wilson was being re-tried, that Coleman's credibility was at issue, and that Coleman could not be located. Trutenko also testified, among other things, that Coleman was not discussed during the Zoom prep session, and that Trutenko did not recall Coleman's federal plea deal or speaking to federal prosecutors on Coleman's behalf.

¶ 25    The OSP dismissed the case against Wilson with prejudice. The CCSAO immediately

fired Trutenko and engaged a private attorney to represent him, no doubt recognizing (perhaps for the first time) that its own interests were in serious conflict with Trutenko's. Trutenko allegedly permanently deleted the entire contents of his work-issued cellphone and purged data from his work-issued laptop. Horvat was fired later.

¶ 26    The resulting indictment charges Trutenko with perjury, obstruction of justice, official misconduct, and violations of the Local Records Act. (We will leave Horvat's charges aside for now.) Two of the obstruction counts, and the Local Records Act count, pertain to the destruction or concealment of data on Trutenko's government-issued devices. Those charges are not relevant to the issues before us. The remaining obstruction count, and three (of the four remaining) counts of official misconduct, all allege, on alternative legal theories, that Trutenko failed to disclose his ongoing relationship with Coleman. The two perjury counts are based on Trutenko's testimony (1) that Coleman's name never came up in the video conference, which is also the basis for the remaining official-misconduct charge, and (2) that Trutenko had no recollection of Coleman's federal plea deal.

¶ 27                                III

¶ 28    Against this backdrop, we can now take a closer look at the purported attorney-client relationship between Trutenko and Fangman. The evidence on this topic comes from the mid-trial evidentiary hearing. The State called Fangman and Jessica Scheller, then the chief of the Advice, Business, and Complex Litigation Division of the CCSAO, the division responsible for handling subpoenas such as these. The State proffered summaries of pertinent conversations between Trutenko and Fangman, culled from Fangman's notes, and e-mails and text messages

exchanged between them. The parties also cited various statements made on the record in the Wilson case.

¶ 29    Before we summarize the evidence from the evidentiary hearing—the live testimony of Scheller and Fangman and the State's oral proffer described above—we make two preliminary observations. First, as we find ourselves in the rare instance of reviewing evidence, testimony, and oral proffers midtrial, we emphasize here that we are not commenting on the truth of this evidence or binding the trial court to any factual findings whatsoever.

¶ 30    Second, we would note that while the exhibits have been filed under seal, the evidence we discuss was proffered and discussed in open court, in the presence of the media. Reporters from the *Chicago Tribune* attended the evidentiary hearing and published an article about it on November 8, 2023.[1]

¶ 31    Trutenko never objected to the presence of reporters or asked the trial court to close the hearing to the public. Nor has he asked for the appellate briefs to be filed under seal. Given this lack of insistence that his purportedly privileged communications with Fangman should be treated as confidential, we perceive no barrier to discussing them freely.

¶ 32    The testimony of Fangman and Scheller was consistent, in essentials, about Fangman's role in the Wilson case, at least as the CCSAO understood it. Collectively, they testified to the

---

[1] See Christy Gutowski, Madeline Buckley, & Stacy St. Clair, *Trial of Former Cook County Assistant State's Attorney Halted for Appeal After Ruling Rebuking Kim Foxx's Office*, Chi. Trib., Nov. 8, 2023, https://www.chicagotribune.com/2023/11/08/trial-of-former-cook-county-assistant-states-attorneys-halted-for-appeal-after-ruling-rebuking-kim-foxxs-office/ [https://perma.cc/Y38U-U6WS].

following. On September 9, 2020, Scheller assigned the document subpoena to Fangman. It was understood that his only client in this role was the CCSAO, as the keeper of the records under subpoena. Fangman's task was to identify any responsive records and to determine whether to move to quash the subpoena or otherwise negotiate its scope.

¶ 33    The next day, Fangman filed a motion to quash the document subpoena, and a hearing was set for September 15. In preparation for that hearing, Fangman spoke to Trutenko on September 11 and 14 to learn about the Wilson case and Trutenko's role in it. According to the proffer, Coleman was not yet a topic of discussion. And these conversations took place *before* the purported attorney-client relationship arose, in the trial court's view, on September 15.

¶ 34    The motion to quash remained pending beyond the September 15 hearing, and Fangman continued to confer with Trutenko beyond that date to help assess whether the CCSAO would continue to oppose the document subpoena. But in the early morning on September 15, Trutenko was served with the witness subpoena for his trial testimony. He immediately e-mailed Fangman. Within minutes, Fangman responded, asking Trutenko to forward the subpoena to Scheller and adding, "[w]e will file a motion to quash." Thus began their attorney-client relationship, as the trial court saw it.

¶ 35    Fangman's off-the-cuff assessment didn't hold up. He assumed, perhaps reflexively, that because Trutenko had served as the prosecutor in the 1989 trial, he could not be called as a witness unless he met the requirements of the "special witness" doctrine, where a prosecutor cannot be made to testify unless the relevant, material evidence is unavailable from another source. See, *e.g.*, *People v. Willis*, 349 Ill. App. 3d 1, 16-17 (2004). But later that day, Fangman

- 10 -

learned from Wilson's attorneys that the defense was probing Trutenko's relationship with Coleman, and that both subpoenas took aim at this topic (among others). Because Coleman was deemed unavailable, the CCSAO determined that the elements of the "special witness" doctrine were likely met and decided, on this basis, that it would not move to quash the witness subpoena. So that was the last of any notion of moving to quash the *witness* subpoena, though the motion to quash the document subpoena remained.

¶ 36    According to the State, Trutenko was not consulted about the decision not to move to quash the witness subpoena. Fangman and Scheller testified that it was not his personal decision to make but rather a decision to be made by the CCSAO through the relevant chain of command. More specifically, Fangman testified that Trutenko did not instruct him to file the motion to quash, nor did Fangman seek Trutenko's input on the decision or discuss the strategy or reasoning behind the decision, "[b]ecause it was the decision of the State's Attorney's office whether or not to move to quash the subpoena."

¶ 37    But Fangman did confer again with Trutenko on September 15. As Fangman understood it, he was still gathering facts relevant to the CCSAO's position on the document subpoena. In particular, he was trying to understand how Trutenko's personnel file might relate to Coleman. Their conversation thus turned to Coleman, his role in the previous trial, and the fact that he was presumed dead and thus deemed unavailable. According to the State's oral proffer at the evidentiary hearing, there was "substantial discussion" of Coleman's plea deals—including the federal plea deal that Trutenko helped to broker and whether it had been disclosed.

¶ 38    On September 17, a second hearing was held on the motion to quash the document

subpoena. Judge Hooks asked Fangman if he would also represent Trutenko when he testified. Fangman answered that it would likely be another ASA, "but because Mr. Trutenko is a current Assistant State's Attorney and he would be testifying related to his role in his previous employment also, the State's Attorney's office definitely represents him as a deponent."

¶ 39　The September 17 hearing prompted a lengthy call between Fangman and Trutenko. The focus, according to the State, was again on Coleman. A key topic was whether Trutenko continued to have contact with Coleman after the 1989 trial, as Wilson's attorneys were claiming. Fangman would testify about how he broached the issue repeatedly, and from multiple directions, thus underscoring its importance to the case. Trutenko continued to deny any further dealings with Coleman. They also discussed the deposition that Trutenko sat for in a civil rights case filed by Wilson's brother Andrew.

¶ 40　Fangman testified that, still struggling to understand the potential connection between Trutenko's personnel file and Coleman, he broached these topics again during another lengthy conversation on September 21. Coleman's plea deals, and their alleged continued contacts, were center stage. Throughout their back-and-forth, Trutenko continued to deny that he had any idea what the defense might be trying to get at.

¶ 41　As the State noted at the hearing, Fangman had already disclosed many of the pertinent statements from these conversations in a declaration that he filed on October 21, 2020, as part of the CCSAO's response to a motion for sanctions that Wilson's attorneys filed after the dismissal of his case. Fangman's declaration was served on Trutenko through the private attorney that the CCSAO had engaged for him. Trutenko never objected to the disclosure of these statements in

the declaration on grounds of attorney-client privilege (or anything else).

¶ 42     On September 24, when a date was set for Trutenko's testimony the following week, Fangman reached out to his chain of command to ensure that the witness subpoena, which had lingered unassigned for nine days, was assigned to another ASA. In these e-mails, Fangman stated that "SAO represents [Trutenko]," and that Fangman "can prep [him]," as he had "been planning to do." But by his own assessment, things were not going well for Fangman in court, so there could be value in having "a different face" at Trutenko's testimony. Trutenko was not included on these e-mails, but he does rely on them in seeking to establish his claim of privilege.

¶ 43     In any event, Horvat was tapped for this role. Fangman testified that, on September 26, he conveyed what he knew, or thought he knew, to Horvat. The next day, he facilitated the Zoom prep session with special prosecutor Rosen. Fangman participated in the prep session both to ensure that Horvat was fully up to speed and to see if anything might "shed more light" on the asserted relevance of Trutenko's personnel records, since the motion to quash was still pending. As we noted above, Coleman was the main topic of conversation.

¶ 44     Fangman and Scheller also testified, more generally, about the nature and scope of the representation undertaken by Fangman. Fangman conferred with Trutenko for fact-finding purposes, as he fashioned the CCSAO's response to the document subpoena. Because Fangman was assigned to handle that subpoena, and nothing more, Trutenko was never his client. Scheller never told either Fangman or Trutenko that the former represented the latter. She never issued an engagement or retention letter. Fangman made no promises of confidentiality to Trutenko, nor was the issue ever discussed. In fact, Fangman testified that he could not have kept his

communications with Trutenko strictly confidential; at a minimum, he had a "responsibility ***
to report to [his] boss" and disclose any pertinent information to the CCSAO chain of command.
Fangman also testified that no "legal advice" was solicited or dispensed in their conversations.

¶ 45      To put a somewhat finer point on the topic, they testified, Fangman did not represent
Trutenko in either his official or his individual capacity. Rather, it was Horvat who represented
Trutenko—in his official capacity only—by virtue of handling the witness subpoena. Fangman
explained that when he said "SAO represents [Trutenko]," he meant in Trutenko's official
capacity. Fangman and Scheller both stressed that Fangman could not have represented Trutenko
in his individual capacity as a matter of state law: an ASA may represent county or state officials
in their "official capacity" only, and an ASA is prohibited generally from representing
individuals in litigation. 55 ILCS 5/3-9005 (West 2022). Presented with this express statutory
language, the trial court found that the distinction between Trutenko's individual and official
capacity was "in this context *** a false dichotomy."

¶ 46      The defense cross-examined Scheller and Fangman at the hearing but did not call any
witnesses of its own. The trial court invited Trutenko to testify and properly admonished him that
he would not be waiving his fifth-amendment rights at trial by doing so. He declined. Instead,
Trutenko pointed to the following evidence as support for his privilege claim.

¶ 47      The first two pieces of evidence came from Horvat's initial court appearance in the
Wilson case. Horvat introduced himself as "the attorney for Mr. Trutenko" and stated on the
record that "there was an attorney-client relationship before I came into the picture." During that
same exchange with Judge Hooks, Trutenko stated that he had "two" attorneys present in court,

referring, of course, to Horvat and Trutenko.

¶ 48    The other two pieces of evidence came from testimony that had already been offered at the bench trial. According to Trutenko's counsel, Joe Magats, the former first assistant in the CCSAO, "testified that there was an attorney-client relationship" between Fangman and Trutenko. More precisely, counsel asked Magats if Fangman was "assigned to assist in the [*sic*] representing [Trutenko] on the testimony subpoena," to which Magats answered, "I believe so." Recall that it was Scheller, not Magats, who had direct responsibility for assigning attorneys to subpoenas and who actually assigned Fangman and Horvat to their respective roles.

¶ 49    And finally, according to Trutenko's counsel, special prosecutors Rosen and O'Rourke testified at the bench trial that Fangman was the "primary" or "only person they dealt with, as far as the lawyer for [Trutenko]." It doesn't much matter whether the special prosecutors viewed Fangman as "the lawyer for [Trutenko]." But for what it's worth, Rosen testified that he didn't. (O'Rourke didn't speak to the matter.) To the contrary, Rosen thought Fangman "was representing the Cook County State's Attorney's Office on the document subpoena." The special prosecutors were also clear that they "dealt with" Horvat, too—when it came time to prepare Trutenko for his testimony on September 27.

¶ 50    The trial court found that an attorney-client relationship arose between Fangman and Trutenko by September 15, 2020, and thus that communications between them, from this point forward, were privileged. (Except for the September 27 witness prep session, since third parties, namely, the special prosecutors, were present.)

¶ 51    The trial court further found, *sua sponte*, that the communications at issue—both before

and after September 15—were irrelevant and/or cumulative and contained sweeping amounts of hearsay. The trial court did not completely bar Fangman from testifying within the constraints imposed by these rulings. He could not, for example, testify as to his conversation with Trutenko on September 21, 2020, when the subject of Coleman was a major topic (according to Fangman).

¶ 52    After the communications were excluded from evidence, the State filed this interlocutory appeal, supported by a certificate of substantial impairment. The Trutenko and Horvat cases, which are being jointly tried, were consolidated for purposes of the appeal. The CCSAO filed a brief as intervenor, in which it reiterated the position articulated by Scheller and emphasized that the purported attorney-client relationship found by the trial court is prohibited by state law.

¶ 53                                    ANALYSIS

¶ 54    The State raises several grounds for reversal of the trial court's finding of an attorney-client privilege between Fangman and Trutenko. We need not and do not reach all of them. For example, the State argues that Trutenko has long waived any alleged attorney-client privilege—several times over, in various ways. We do not mean to imply that this or other arguments are unworthy of consideration. But given our resolution, we need not reach them.

¶ 55                                         I

¶ 56    But before we consider the substantive question of privilege, we address the State's preliminary argument that Trutenko's objection based on attorney-client privilege was untimely, coming as it did midtrial instead of pretrial. The State claims that Trutenko's objection based on attorney-client privilege was a motion to suppress, and thus Trutenko was required to file it before trial, before jeopardy attached.

¶ 57    We find no merit to this argument. True, several statutes in the Code of Criminal Procedure govern "motions to suppress" that are filed on various grounds, principally of a constitutional variety like the fourth or fifth amendment, which contain general rules that they must be filed pretrial but with exceptions. See, *e.g.*, 725 ILCS 5/114-11(a), (g) (West 2022) (motion to suppress confession); *id*. § 114-12(a), (c) (motion to suppress evidence illegally seized); *id*. § 108A-9(a), (b) (motion to suppress electronic recording); *cf. id*. § 107A-2(j)(1) (motion to suppress witness identification from police lineup but no timing requirement). Each of those statutes requires a motion in writing and all but one requires, at least generally, that they be filed pretrial.

¶ 58    The State does not explain why we should go beyond those statutes, with their carefully limited subject matter, and judicially insert objections based on attorney-client privilege into the definition of a "motion to suppress" as that phrase is used in the law. And we can think of no reason why we should. In our experience, we have never heard attorney-client privilege objections characterized that way. State law does not define them as such. No supreme court rule or rule of evidence mandates that interpretation.

¶ 59    Granted, in substance, a motion to "suppress" is merely a motion to "exclude" by another name; the words are synonyms in this context. If we were just haggling over words, we might use them interchangeably. But the State is assigning a requirement to a "motion to suppress"— that it be filed pretrial. That is not quibbling over language; that is attaching a strict procedural prerequisite to the assertion of a fundamental and sacred privilege without any basis in the law to do so. And why stop there—by the State's reasoning, any attempt by any criminal defendant to

exclude any evidence (or even object to it) would transform into a "motion to suppress," with a phantom requirement that the motion be raised pretrial or forfeited. That cannot be.

¶ 60     The only other source of law is Illinois Rule of Evidence 104(a) (eff. Jan. 1, 2011), which establishes the procedure for determining issues of privilege. That rule merely provides for the "preliminary" consideration of privilege questions by the court. *Id*. There is no requirement of a written motion—or a motion at all—much less a timing requirement for asserting the privilege. A "preliminary" consideration is not automatically something that must be raised pretrial; that word simply reflects the commonsense notion that a court will determine whether testimony is covered by the attorney-client privilege *before* it is heard by the jury, not after.

¶ 61     Absent a statute, supreme court rule, or rule of evidence requiring an objection based on attorney-client privilege to be in writing and filed pretrial, we will not create one by judicial fiat.

¶ 62     Here, Trutenko did not file a motion to suppress the statements based on attorney-client privilege. He did not even make an oral motion. He merely *objected* to the testimony on the basis of attorney-client privilege. He was perfectly within his rights to do so.

¶ 63     To be sure, issues as weighty as attorney-client privilege are typically ironed out pretrial via motions *in limine*. Most circuit judges surely would prefer it that way. Our circuit judge here, an experienced and respected jurist, was one of them. He asked the parties for pretrial motions on substantive issues to avoid tying up the trial once it began. And he did not hide his frustration that Trutenko waited until after trial commenced to raise his objection, when he clearly had the opportunity to raise this issue pretrial.

¶ 64     Indeed, had the trial court denied Trutenko's privilege objection on that ground alone, we

likely would have upheld it. Trial courts have wide discretion in managing their cases, including the filing of motions *in limine*, whether to require them, whether to rule pretrial or defer until trial, how to conduct its hearings, and whether to impose sanctions on parties who do not respect the court's pretrial scheduling orders. See *People v. Owen*, 299 Ill. App. 3d 818, 823-24 (1998).

¶ 65    To its credit, the trial court here took a different route. The court allowed the objection to be made, noting the defense's claim that it had received a significant "dump" of documents before trial, that this case moved quite quickly from indictment to trial compared to other cases in Cook County, and most importantly, emphasizing the gravity of the issue being raised. By no means could we find an abuse of discretion in the circuit court's decision to allow this objection to be raised midtrial. The State's claim of untimeliness is without merit.

¶ 66    The confusion here may result from the State blurring the difference between a recognized "motion to suppress" in the law, on the one hand, and the State's ability to appeal orders "suppressing evidence" under Illinois Supreme Court Rule 604(a)(1) (eff. Oct. 19, 2023), the mechanism by which the State prosecutes this appeal, on the other. They are manifestly different uses of that phraseology; the latter is far broader than the former. It merits a brief discussion.

¶ 67    Again, this appeal comes to us via Rule 604(a)(1), which allows the State to appeal orders "suppressing evidence." *Id*. Our supreme court has made clear that, for purposes of Rule 604, this phrase has an expansive meaning, not limited to rulings on the few types of motions to suppress that the law recognizes. *People v. Holmes*, 235 Ill. 2d 59, 70 (2009) (noting supreme court's "repeated emphasis that 'the substantive effect of a trial court's pretrial order, not the

label of the order or its underlying motion, controls appealability under Rule 604(a)(1).' "
(quoting *People v. Drum*, 194 Ill. 2d 485, 489-90 (2000)).

¶ 68    That is, an order *other than* one of the few recognized motions to suppress can be an
order "suppressing evidence" under the rule; "there is no substantive difference between
excluded evidence and suppressed evidence for purposes of Rule 604(a)(1)." *Id*. (quoting *Drum,*
194 Ill. 2d at 485). The court focuses on the substance of the trial court's order and whether it
has the effect of suppressing evidence—*i.e.*, whether the evidence is wholly excluded from the
factfinder's consideration or whether the State has an alternative avenue to admitting it. *Id*.

¶ 69    For example, the denial of a motion to compel a defendant to disclose the passcode on his
smart phone was appealable under Rule 604(a)(1), though on its face it "did not directly suppress
specifically identified evidence," because the order "prevented the State from accessing any
evidence on the phone and presenting it to the factfinder, thereby having the substantive effect of
suppressing evidence." *People v. Sneed*, 2023 IL 127968, ¶ 56. The denial of a motion to admit
the prior testimony of two witnesses who refused to testify at trial was appealable under Rule
604(a)(1), because "[s]ubstantively, the trial court's order bars the use of this testimony at
defendant's trial, regardless of whether the order is characterized as 'excluding' the testimony or
'suppressing' it." *Drum,* 194 Ill. 2d at 491.

¶ 70    In other words, two things can be true at the same time: (1) Trutenko's objection based
on attorney-client privilege was not a "motion to suppress," at least not insofar as that moniker
would subject him to some general rule that it be raised pretrial; and (2) the ruling sustaining that
objection (on privilege and other evidentiary grounds) was an order "suppressing evidence"

under Rule 604(a)(1).

¶ 71    As we reject the OSP's challenge to the timeliness of Trutenko's privilege objection, we move to the substance of the privilege question.

¶ 72                                      II

¶ 73    As the party asserting an attorney-client privilege, it was Trutenko's burden to establish its elements by "showing the facts which give rise to the privilege." (Internal quotation marks omitted.) *In re Marriage of Decker*, 153 Ill. 2d 298, 328 (1992). The privilege applies only "[w]here legal advice of any kind is sought from a lawyer in his or her capacity as a lawyer [and] the communications relating to that purpose [are] made in confidence by the client, *** unless the protection is waived" by the client. *Center Partners, Ltd. v. Growth Head GP, LLC*, 2012 IL 113107, ¶ 30. We review a finding of attorney-client privilege *de novo*. *Id.* ¶ 65.

¶ 74    "The attorney-client privilege, like all testimonial privileges, is inherently inconsistent with the search for truth because it prevent[s] otherwise relevant and admissible evidence from being disclosed." (Internal quotation marks omitted.) *People v. Radojcic*, 2013 IL 114197, ¶ 41. The privilege thus "constitutes a departure from the general duty to disclose and, accordingly, must be strictly confined within its narrowest possible limits." (Internal quotation marks omitted.) *Id.*

¶ 75                                      A

¶ 76    To recap some background facts: as far as the CCSAO was concerned, Fangman was never Trutenko's lawyer, full stop. He was the CCSAO's lawyer, assigned to represent the office on the document subpoena, and his communications with Trutenko were fact-finding efforts in

the service of that singular role. Horvat was assigned to represent Trutenko in connection with the witness subpoena, but only in Trutenko's official capacity as a government officer and agent of the CCSAO.

¶ 77    The trial court saw things differently. It found that an attorney-client relationship arose from Fangman's perceived role in handling the witness subpoena before Horvat took over. The trial court acknowledged that the relationship was unintended, and vigorously disavowed, by Fangman and Scheller. But from Trutenko's perspective at the time, it reasonably appeared that Fangman represented him in connection with the witness subpoena.

¶ 78    The view that Fangman wandered into the role of Horvat's *de facto* predecessor is a debatable one, finding at least some factual support in the record. But for reasons that will soon become evident, the trial court never specified whether, in its view, Fangman represented Trutenko in his individual or official capacity. There was undisputed evidence that Scheller appointed Horvat as Trutenko's official lawyer, not his personal one. And as Scheller and Fangman emphasized, that limitation was not just a contingent fact about Horvat's particular relationship with Trutenko. It was also a matter of law.

¶ 79    By statute, an ASA (Fangman or Horvat) may only represent a county or state officer (Trutenko) in an action or proceeding brought against the officer in his or her "official capacity." 55 ILCS 5/3-9005(a)(4) (West 2022); *People v. Wilkinson*, 285 Ill. App. 3d 727, 733 (1996) ("A State's Attorney is the statutory attorney for a county officer who requires legal representation in his official capacity.").

¶ 80    So even if we assume, for the sake of argument, that Fangman represented Trutenko in

connection with the witness subpoena, that representation was limited, as a matter of law, to Trutenko's official capacity.

¶ 81    The trial court found the distinction between official-capacity and individual-capacity representation, as enforced by the statute, to be "in this context *** a false dichotomy." The trial court's point, as we understand it, is this: in the "context" of a privilege analysis, it doesn't matter whether Fangman represented Trutenko in his official or individual capacity. Either way, representation would give rise to a privilege that was Trutenko's, personally, to assert or waive.

¶ 82    Trutenko appears to take the same position in his brief: "It is immaterial that an ASA like Fangman cannot represent private individuals. As the trial court found, at the time, Mr. Trutenko was not a private individual. He was an Assistant State's Attorney and entitled to representation under the statute. (55 ILCS 5/3-9005.) That was why Fangman represented him."

¶ 83    That position is simply wrong. The question is not whether Fangman was representing Trutenko. The question is not whether their conversations were "privileged." The question is *who holds* that privilege—who is the client? And to answer that question, the difference between representing someone in their official capacity versus their personal capacity is not immaterial or a false dichotomy; it is the dispositive factor. If Fangman represented Trutenko in his official capacity, as opposed to his individual capacity, then Fangman's true client—and thus the holder of any attorney-client privilege—was the CCSAO.

¶ 84    The United States and Illinois Supreme Courts have recognized that the "objectives" of the attorney-client privilege apply to "governmental clients" or " 'government entities,' " including " 'obtaining legal advice founded on a complete and accurate factual picture.' " *United*

*States v. Jicarilla Apache Nation*, 564 U.S. 162, 169-70 (2011) (quoting Restatement (Third) of the Law Governing Lawyers § 74, cmt. b, at 573-74 (2000)); *In re Information to Discipline Certain Attorneys of the Sanitary District of Chicago*, 351 Ill. 206, 268 (1932) (applying privilege to public entity); *Fox Morraine, LLC v. United City of Yorkville*, 2011 IL App (2d) 100017, ¶ 63 (same); *United States v. Zingsheim*, 384 F.3d 867, 871 (7th Cir. 2004) ("The attorney-client privilege covers conversations between the prosecutors (as attorneys) and client agencies within the government."). And that is exactly what the CCSAO dispatched Fangman to provide here.

¶ 85    Under our supreme court's rules, the same general principles that govern the relationship between "organizational clients," their attorneys, and their other agents apply both to private organizations, like corporations, and to "governmental organizations," like the CCSAO. Ill. R. Prof'l Conduct (2010) R. 1.13 cmt. 9 (eff. Jan. 1, 2010). This includes the attorney-client privilege. Restatement (Third) of the Law Governing Lawyers § 74, cmt. a, at 573 (2000) (privilege "ordinarily applies to governmental agencies as to other organizations").

¶ 86    Because an "entity" or "organizational client" can only act through its agents, the latter will inevitably "communicate[ ] with the organization's lawyer in [their] organizational capacity," or official capacity. Ill. R. Prof'l Conduct (2010) R. 1.13 cmt. 2 (eff. Jan. 1, 2010). "This does not mean, however, that [the organization's agents] are the clients of the lawyer" during those discussions. *Id.* Rather, the client remains the organization itself, and as always, "the privilege belongs to the client." *Lama v. Preskill*, 353 Ill. App. 3d 300, 305 (2004); Ill. R. Prof'l Conduct (2010) R. 1.13 cmt. 2 (eff. Jan. 1, 2010); *John Doe Corp. 1 v. Huizenga*

*Managers Fund, LLC*, 2021 IL App (2d) 200513, ¶ 84 ("the privilege belongs to the [organization] itself").

¶ 87    In short, when an organization's attorney represents or otherwise communicates with an agent of an organization in his or her official (organizational) capacity, those conversations are privileged, but the privilege belongs to the organization, as the principal and true client.

¶ 88    Here, Trutenko's involvement in the 2020 Wilson trial stemmed directly from his role as the prosecutor in Wilson's 1989 trial. Thus, he was subpoenaed to testify in his official capacity, as an agent of the CCSAO and the State more generally. He communicated with Fangman in his official capacity. The CCSAO had its own interests in the witness subpoena, which sought to compel testimony from an agent of the CCSAO about his—and thus the State's—conduct and alleged non-disclosures in a criminal prosecution. Fangman was, at least in the first instance, the CCSAO's lawyer, and he could not represent Trutenko in *anything but* his official capacity.

¶ 89    So even if we grant, for argument's sake, that Fangman represented Trutenko in his official capacity, his conversations with Trutenko were covered by an attorney-client privilege that belongs to—and is controlled by—the CCSAO, not Trutenko personally. See *In re Grand Jury Investigation*, 399 F.3d 527, 534-35 (2d Cir. 2005) (noting that "in the government context, the individual consulting with his official attorney may not control waiver of the privilege"). And the CCSAO has affirmatively waived its privilege.

¶ 90    Put differently, Trutenko has no attorney-client privilege to assert unless he can establish that Fangman represented him in his individual capacity, as his *personal* lawyer, bound to protect his *personal* interests, rather than those of the CCSAO, and ultimately, the People. But Fangman

could not undertake that representation as a matter of law.

¶ 91                                                                 B

¶ 92     Trutenko was not "entitled *** under the statute," in his counsel's phrase, to a personal lawyer at taxpayer expense. As a government official, conducting public business, Trutenko was entitled to an official lawyer, one whose ultimate obligation was to serve the public interest and uphold the law. See 55 ILCS 5/3-9005(a)(4) (West 2022). By limiting ASAs to official-capacity representation, with a privilege that runs to and is controlled by the relevant government entity, this statute helps ensure that ASAs, as government lawyers, serve the interests of the public, not the personal interests of individual officials.

¶ 93     "Government lawyers," including ASAs like Fangman, "are public servants, and their client is the government, not officeholders in their personal capacities." *In re Grand Jury Subpoena*, 828 F.3d 1083, 1093 (9th Cir. 2016). Thus, in certain contexts, " 'the Government may invoke the attorney-client privilege' " to prevent disclosure of "conversations between government officials and government lawyers," but there is simply no precedent for holding "that officeholders in their personal capacity may invoke the privilege." (Emphasis omitted.) *Id.* at 1092 (quoting *Jicarilla Apache Nation*, 564 U.S. at 170).

¶ 94     Even when a government official's potential or alleged "noncompliance with *** legal obligations" is the topic of conversation—as it was here, since that is exactly what Wilson put at issue—this "does not mean that during those conversations, the government lawyers are acting as the personal attorneys for the officeholders." *Id.* at 1093.

¶ 95     Indeed, when the federal court of appeals searched for relevant precedent in 2016, it had

this to report: "In no instance, as far as we are aware, has a former officeholder successfully claimed that a government staff lawyer discussing a matter relating to official business was representing the officeholder personally during a conversation had while both were government employees." *Id.* at 1092. Our updated search has come up equally empty.

¶ 96 It is widely, if not universally, understood that when a government official speaks to a government attorney, the privilege belongs to the government. A holding that recognized a *personal* attorney-client privilege between Trutenko and Fangman, one that Trutenko controlled, would be a singular outlier without any identifiable precedent. It would flatly contradict section 3-9005 of the Counties Code, the very statute on which Trutenko relies. It would undermine the statute's obvious purpose of tethering government lawyers to the People's interests. And it would fundamentally blur the distinction between government lawyers and private counsel.

¶ 97 As public servants, government lawyers have a unique responsibility to serve the public's compelling interests in "honest government" and "compliance with the law" by public officials; to serve those interests, government lawyers are thus duty-bound to assist the law in "uncovering illegality" and "exposing wrongdoing" among those who hold public office. *In re a Witness Before the Special Grand Jury*, 288 F.3d 289, 293 (7th Cir. 2002); *In re Lindsey*, 158 F.3d 1263, 1266, 1273 (D.C. Cir. 1998) (*per curiam*); *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 921 (8th Cir. 1997).

¶ 98 This stands in stark contrast to the duties of private counsel, whose appropriate role is to defend clients against criminal charges and protect them from public exposure. *In re Special Grand Jury*, 288 F.3d at 293; *In re Lindsey*, 158 F.3d at 1272. Precisely this difference has led

our supreme court to caution that the usual expectations of confidentiality will often have to yield to a government lawyer's overriding duties to prevent, disclose, and remedy wrongful official acts. Ill. R. Prof'l Conduct (2010) R. 1.13 cmt. 9 (eff. Jan. 1, 2010).

¶ 99    Government lawyers thus "stand in a far different position from members of the private bar" when an investigation or prosecution of alleged "criminal offenses *** committed by those in government" has commenced. *In re Lindsey*, 158 F.3d at 1272. True, the accused official's personal interests in avoiding legal or other exposure are particularly acute when the criminal process has been brought to bear. But so too are the duties of a government lawyer, including one who may have represented the accused in his official capacity, as an agent of the attorney's government client. In this context, any duties the government lawyer may have owed to the accused must yield to the "higher, competing duty to act in the public interest." *In re Special Grand Jury*, 288 F.3d at 293; see *In re Lindsey*, 158 F.3d at 1272; *In re Grand Jury Subpoena Duces Tecum*, 112 F.2d at 921.

¶ 100    This point has implications for the attorney-client privilege, for reasons that the Seventh Circuit has very aptly described: "It would be both unseemly and a misuse of public assets to permit a public official to use a taxpayer-provided attorney to conceal from the taxpayers themselves otherwise admissible evidence of financial wrongdoing, official misconduct, or abuse of power." *In re Special Grand Jury*, 288 F.3d at 293; see *In re Grand Jury Subpoena Duces Tecum*, 112 F.2d at 921 (it would be "a gross misuse of public assets" to allow "any part" of government to "use its in-house attorneys as a shield against the production of information relevant to a *** criminal investigation").

- 28 -

¶ 101   Trutenko may not direct a government lawyer to conceal otherwise admissible evidence of his alleged misconduct in office from the criminal process. That "unseemly *** misuse of public assets" is precisely what the trial court's ruling allowed Trutenko to do, in the name of the attorney-client privilege. That ruling was error.

¶ 102                                                    C

¶ 103   To answer the privilege question, the trial court conducted a factual inquiry into whether Trutenko could reasonably believe, in a nutshell, that Fangman was the attorney responsible (at least initially) for handling the witness subpoena. This is a debatable point, and we are not here to quarrel with the trial court's answer to this particular question, as far as it goes, or to review any of the factual findings that the court made along the way.

¶ 104   Our problem, in the first instance, is with the guiding legal assumption of this inquiry. It makes all the difference whether Fangman's perceived role in handling the witness subpoena landed him the role (if any at all) of Trutenko's *official* versus *personal* attorney. Neither the trial court's inquiry nor Trutenko's arguments appreciate that this distinction is nothing other than the law's way of identifying the true client, and thus the holder of the privilege, in an organizational context.

¶ 105   So Trutenko may have thought that the official-capacity representation to which he was "entitled under the statute" gave *him* a personal attorney-client privilege with Fangman. But that doesn't make it so. *In re Grand Jury Subpoena Duces Tecum*, 112 F.2d at 923 ("[W]e know of no authority *** holding that a client's beliefs, subjective or objective, about the law of privilege can transform an otherwise unprivileged conversation into a privileged one.").

¶ 106   Trutenko's true burden on this issue is to show that Fangman was his *personal* attorney, with all that entails. The trial court, it bears noting, never found that Fangman acted as Trutenko's personal attorney, believing the distinction between official and personal representation to be a "false dichotomy." If anything, the trial court seemed to embrace the notion that Fangman was representing Trutenko in his official capacity. But all that mattered, in the trial court's view, was that Fangman "represented" Trutenko, one way or the other.

¶ 107   And it would have been a remarkable ruling, indeed, had the trial court determined that Fangman represented Trutenko in his personal capacity. Under the general test for an attorney-client relationship that the trial court applied, it would amount to this: an experienced prosecutor was somehow led to reasonably believe that his fellow prosecutor at the CCSAO offered him personal representation—in connection with a defense subpoena arising from allegations of his own misconduct in a pending criminal case—that was prohibited by state law.

¶ 108   Suffice it to say that nothing Fangman did here, as far as the hearing evidence established, comes anywhere close to showing that Trutenko was duped into this belief. And to repeat, we can reach that conclusion without having to overturn the particular findings that the trial court actually made.

¶ 109   This shared legal error is part of a more general failure to see the forest for the trees. The privilege issue, as it arises in this case, is not a particularly fact-bound question; it is, as we have insisted, a matter of principle. Trutenko would arrogate to himself the authority to control a *government* lawyer, and he would demand that a government lawyer protect his own *personal* interest in concealing evidence of his alleged misconduct in public office from the criminal

process. He would do this in the name of the attorney-client privilege and, ironically enough, the good-government provisions of section 3-9005.

¶ 110    That is the real heart of the matter—and reason enough to reject Trutenko's assertion of a personal attorney-client privilege with Fangman. So we will leave it at that, and close with a few observations, mostly to ensure that our decision today is not misunderstood.

¶ 111    For one, in a criminal investigation or prosecution, public officials have the same rights as anyone else, and nothing we have said diminishes those rights in any way. A public official who seeks confidential legal advice and candid discussion of possible criminal exposure can of course consult a private attorney, and those consultations will be fully covered by the attorney-client privilege. Nor does the government lawyer's duty to disclose illegal conduct in office imply any duty of self-incrimination; the fifth-amendment privilege is unaffected by one's status as a public official. Far from diminishing the rights of public officials, our holding today simply ensures that they do not help themselves, at taxpayer expense, to an *additional* layer of legal protection in the criminal arena: they may not assert control over a government lawyer's ability to provide probative evidence of their alleged misconduct in office.

¶ 112    Our insistence on the fundamental difference between government lawyers and private counsel should not be taken to cast doubt on any statutes that may specifically provide for a government lawyer to represent a public official in his personal capacity. And we express no view about the application of the privilege in that context. But to the extent that such statutory arrangements may exist, section 3-9005 of the Counties Code, the law that entitled Trutenko to official-capacity representation, is not one of them. And Fangman was not a lawyer of this kind.

He did not stand in the shoes of private counsel.

¶ 113   Lastly, it is one thing to hold, as we do here, that any attorney-client privilege that arose in connection with the witness subpoena belonged to the CCSAO. It would be quite another to hold that the CCSAO could *validly assert* that privilege here. Several federal circuits have held that the government's usual attorney-client privilege must yield to a criminal probe of one of its officials. *In re Special Grand Jury*, 288 F.3d at 293; *In re Lindsey*, 158 F.3d at 1272; *In re Grand Jury Subpoena Duces Tecum*, 112 F.2d at 921. But that is not a question we face at this juncture, as the CCSAO has waived its privilege with Fangman.

¶ 114   Trutenko has no attorney-client privilege with Fangman. The trial court's order excluding their communications from evidence, on the ground of attorney-client privilege, was error.

¶ 115                                III

¶ 116   After finding that (most of) the Trutenko-Fangman communications were privileged, the trial court went on to find, *sua sponte*, that they were inadmissible for additional reasons that had not been raised by the defense. We consider them in turn.

¶ 117                                A

¶ 118   But as a preliminary matter, the defendants argue that we lack jurisdiction to review the trial court's *sua sponte* rulings because the OSP did not include them in its notice of appeal. We find no merit to this argument, so we will be brief.

¶ 119   We begin with the reminder from our earlier discussion that any order that has the substantive effect of suppressing evidence, regardless of the basis for that order—privilege, a constitutional violation, an evidentiary ruling, or anything else—is appealable under Illinois

Supreme Court Rule 604(a)(1) (eff. April 15, 2024). *Sneed*, 2023 IL 127968, ¶ 56; *Holmes*, 235 Ill. 2d at 70; *Drum,* 194 Ill. 2d at 485.

¶ 120   The trial court incorporated both its finding of privilege and its further *sua sponte* evidentiary rulings into a single omnibus written order, entered on November 8, 2023, addressing the admissibility of the Trutenko-Fangman communications. The order stated that "for the reasons stated in open court *** certain evidence is inadmissible based upon issues of the attorney client privilege (Illinois Supreme Court Rule 502), relevance (Rule 401), hearsay (Rule 802), and the cumulative effect of the evidence (Rule 403)." As specified in the notice of appeal, the OSP "appeal[ed] *** the November 8, 2023 order" and sought "an appellate court ruling reversing [that] order such that evidence of the statements between Fangman and Defendant Trutenko may be introduced in this trial."

¶ 121   "[A] notice of appeal will confer jurisdiction on an appellate court if the notice, when considered as a whole, fairly and adequately sets out the judgment complained of and the relief sought so that the successful party is advised of the nature of the appeal." (Internal quotation marks omitted.) *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 22. In applying this standard, the notice of appeal "is to be liberally construed." *Id.*

¶ 122   The notice of appeal, liberally construed and considered as a whole, "fairly apprised the defendants that the [OSP] was seeking review (and reversal) of the entire order entered on the specified date." *Borchers v. Franciscan Tertiary Province of the Sacred Heart, Inc.*, 2011 IL App (2d) 101257, ¶ 38. Granted, the notice of appeal describes the November 8 order as "finding an attorney-client relationship between Defendant Nicholas Trutenko and Paul Fangman, and

thereby suppressing the statements between Defendant Trutenko and Fangman on grounds of privilege." But this descriptive language, in the context of the notice as a whole, cannot fairly be taken to limit the appeal to this one basis for the trial court's order.

¶ 123   This conclusion is evident from the relief sought: a ruling that allows "evidence of the statements between Fangman and Defendant Trutenko [to] be introduced in this trial." Reversing the privilege finding alone would not result in this relief. In fact, anything short of full review of the order would result in a merely advisory opinion, since it would be "impossible for this court to grant effectual relief." (Internal quotation marks omitted.) *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 20. The descriptive language in the notice of appeal does not paint us into that corner. We have jurisdiction to review the order as a whole and grant any appropriate relief. Ill. S. Ct. R. 604(a)(1) (eff. Apr. 15, 2024); Ill. S. Ct. R. 615(b)(1) (eff. Jan. 1, 1967).

¶ 124                                      B

¶ 125   The trial court ruled that the communications between Fangman and Trutenko were in each instance either hearsay, irrelevant, and/or cumulative of other evidence. We start with the hearsay ruling.

¶ 126   We generally review evidentiary rulings for an abuse of discretion, but our review is *de novo* if "a trial court's exercise of discretion has been frustrated by an erroneous rule of law," such as a misinterpretation of the hearsay rule. (Internal quotation marks omitted.) *People v. Caffey*, 205 Ill. 2d 52, 89 (2001); *People v. Aguilar*, 265 Ill. App. 3d 105, 109 (1994); see *People v. Hall*, 195 Ill. 2d 1, 21 (2000) (exception to discretionary review of evidentiary rulings "applies in cases that involve questions of statutory interpretation [citation], or other questions of law").

Whether a statement is hearsay is a purely legal question, an interpretation of a rule of evidence, which we review *de novo*. *People v. Padilla*, 2021 IL App (1st) 171632, ¶ 120; *People v. Risper*, 2015 IL App (1st) 130993, ¶ 34; *People v. Sundling*, 2012 IL App (2d) 070455-B, ¶ 82; *People v. Saunders*, 288 Ill. App. 3d 523, 525 (1997).

¶ 127   In his testimony at the evidentiary hearing, Fangman described his conversations with Trutenko, just the two of them—if we discount the Zoom conference on September 27 that also included Horvat and the special prosecutors. And we can safely exclude that conversation from our analysis, as the trial court recognized that no privilege attached to that conversation, given the presence of the third-party special prosecutors.

¶ 128   So that conversation aside, the communications were between only Fangman and Trutenko. And the trial court readily recognized that Trutenko's statements to Fangman could not be excluded as hearsay, as they were statements of a party opponent. See Ill. R. Evid. 801(d)(2) (eff. Jan. 1, 2011).

¶ 129   Which left only Fangman's words communicated to Trutenko. The trial court held, in one fell swoop, that all of Fangman's statements to Trutenko were hearsay: "To the extent that they're statements not by the Defendant, Rule 801, 802, talk about hearsay, they're hearsay."

¶ 130   We cannot uphold that ruling for several reasons. First, it obviously cannot be true that simply because out-of-court statements of a party opponent are *not* hearsay by definition, it follows that out-of-court statements by everyone else *are*. The lengthy and detailed hearsay rules in article 8 would be reduced to a sentence or two if that were true.

¶ 131   Second and in that same vein, while a trial court typically makes hearsay objections

statement by statement, and we review them as such, the court here simply ruled that *all* of Fangman's statements were hearsay in one broad stroke. That simply cannot be true, either. Or if it were, some unusual circumstance would be identified that justified the court's wholesale exclusion of testimony. We are aware of no such circumstance here.

¶ 132    And third, as best we can discern from the record, we can confidently say that the vast majority of Fangman's statements appear not to be hearsay at all. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). Generally speaking, Fangman's statements to Trutenko fall into one of two categories.

¶ 133    The first was inquisitorial, not involving any assertions or statements whatsoever. As the trial court noted, the conversations revolved around Trutenko's role in Wilson's 1989 trial and, in particular, his dealings with Coleman. Fangman was obviously not *asserting* anything about these topics to Trutenko, of all people. Fangman was *asking* Trutenko about them, precisely because he did not know, and therefore had little or nothing to assert. In other words, Fangman had no hearsay about Trutenko's dealings with Coleman to offer.

¶ 134    The second category involved statements, to be sure, but ones that were clearly not offered for the truth of the matter asserted. To the extent that Fangman was in a position to assert anything of interest to Trutenko, it was this cluster of facts: Wilson's defense was putting Coleman's credibility front and center in the upcoming (2020) trial; Coleman was presumed dead and thus declared unavailable, and for this reason, the credibility attack now took aim at Trutenko himself, the propriety of his dealings with Coleman, and whether he had maintained contact with Coleman—which is why the defense was seeking his personnel file and testimony.

¶ 135   Fangman's statements to Trutenko were not offered to *prove* any of these facts. These facts were not remotely in dispute. As the transcript of proceedings shows, Wilson's defense lawyer in the 2020 trial had made clear his reasons for the subpoenas and his focus on Trutenko's relationship with Coleman; Fangman was just relaying them to Trutenko.

¶ 136   Rather, Fangman's statements were offered to show their effect on Trutenko, as the listener, a well-established, non-hearsay purpose. *People v. Britz*, 112 Ill. 2d 314, 320 (1986); *People v. Griffin*, 2022 IL App (1st) 190499, ¶ 40. The State wanted to establish that Trutenko was on notice that his (past and current) relationship with Coleman and his conduct at the 1989 trial were at issue in the 2020 trial, as well as the fact that Coleman was unavailable and believed to be deceased. These facts, under the State's theory, would demonstrate that Trutenko stood mute in the face of this information, despite his obligation to disclose relevant, exculpatory information. "A statement that is offered to prove that a listener had notice of the information contained therein, rather than to prove the truth of the matter asserted, is not hearsay." *Piser v. State Farm Mutual Auto Insurance Co.*, 405 Ill. App. 3d 341, 351 (2010). Fangman's statements to Trutenko fall squarely within this category. They are not hearsay.

¶ 137   At the close of its hearsay ruling, the court recognized that this effect-on-the-listener theory of admissibility was accepted in the law but opined that the exception is overused, often allowing in statements that in reality are being offered for their truth. If that is true, this case does not present that example, as we have just noted. In any event, there is no jury here; we are confident that the trial court, acting as both gatekeeper of evidence and finder of fact, will separate the permissible from the impermissible purposes.

¶ 138    To be crystal clear, by no means are we suggesting that *no* hearsay is contained within Fangman's testimony regarding his communications with Trutenko in September 2020. That would making the same error as the trial court in the other direction. The trial court is free to entertain individualized hearsay objections on remand, consistent with what we have said above.

¶ 139    We next consider the question of relevance. Fangman's statements to Trutenko are directly relevant to elements of certain charged offenses. The trial court found otherwise, primarily because (1) it viewed their communications as limited to Trutenko's role in Wilson's 1989 trial, while (2) the indictment only charged conduct in connection with Wilson's 2020 trial. Each of these premises is demonstrably mistaken. In the proffered communications, Fangman also put Trutenko on notice of the issues at the heart of the 2020 trial, as we just described; their relevance is by no means limited to Trutenko's actions in 1989. And the trial court's reading of the indictment is unreasonably narrow.

¶ 140    Count 3 charges Trutenko with obstructing justice. 720 ILCS 5/31-4 (West 2022). To this end, the indictment alleges that Trutenko, "with the intent to obstruct justice, knowingly impeded and hindered the defense and prosecution" in the Wilson case, in that he "failed to disclose his ongoing relationship with [Coleman] and failed to provide information that [he] knew about [Coleman], with knowledge that [Coleman] was a key witness to [Wilson's] prosecution and defense, and such actions by [Trutenko] were material to the issues in the case."

¶ 141    There is no dispute about the conduct elements of the obstruction charge: Trutenko allegedly failed to disclose his ongoing relationship with Coleman, and he failed to provide information that he knew about Coleman's whereabouts, or at least Coleman's availability.

Trutenko admitted as much on the witness stand in the 2020 Wilson trial. But the State must also prove that Trutenko's concealments were *material* to the Wilson case, and that Trutenko withheld information with the requisite mental states, such that he *knowingly* impeded the prosecution and defense of Wilson with the *intent* to obstruct justice. See *id.*

¶ 142   To satisfy these materiality and *mens rea* elements, the State seeks to prove that Trutenko knew—because Fangman told him—that Coleman's credibility was a (if not *the*) central issue in the 2020 Wilson trial, and more specifically, that Coleman was deemed unavailable for cross-examination because nobody could locate him. These points are *exactly* what Fangman, by his own account, conveyed to Trutenko. The pertinent communications thus bear directly on whether Trutenko concealed material information with the mental states required by the obstruction statute. They are anything but irrelevant.

¶ 143   Counts 6 and 7 charge Trutenko with official misconduct, based on these concealments. *Id.* § 33-3(a)(1). The offense requires proof that in concealing what he knew about Coleman, Trutenko *intentionally* failed to perform a mandatory (disclosure) duty required by law. *Id.* The communications putting Trutenko on notice that he had material information in his possession are relevant to the proof of this *mens rea* element.

¶ 144   We thus cannot uphold the court's exclusion of this testimony based on relevance.

¶ 145   Fangman's communications with Trutenko are not only probative of these *mens rea* elements—they are *uniquely* probative, shedding light on Trutenko's mental states that no other evidence can provide. Which is to say that they are not cumulative evidence, the final basis of the trial court's exclusion of this evidence.

¶ 146   The trial court apparently thought they were cumulative because Trutenko admitted that he did not disclose exculpatory information when he testified at the Wilson trial. Granted, Trutenko admitted *that* much, and his testimony thus speaks to the (undisputed) conduct elements of the offenses. But not to the materiality and *mens rea* elements. It should go without saying that Trutenko has never testified or otherwise admitted that he *intended* to obstruct justice, that he *knew* he was impeding the prosecution and defense of Wilson, or to any other required showing about his state of mind.

¶ 147   In addition to Trutenko's testimony at the Wilson trial, the trial court also listed "other testimony in evidence before the court already" and what it called the "stipulated operative facts" as grounds for finding the Fangman-Trutenko communications to be cumulative. It is not clear to us whether any of this, in the trial court's view, rendered Fangman's statements (as opposed to Trutenko's) cumulative. But if so, that is clearly wrong.

¶ 148   The "stipulated operative facts" refers to a brief, bare-bones summary of the 1989 Wilson trial. It stipulates that "[a]t Wilson's 1989 retrial, Assistant State's attorney[ ] Nicholas Trutenko *** acted as prosecutor[ ]," and that the "trial included testimony from William Coleman [that] Wilson admitted to the killings while both men were inmates in the Cook County jail." It goes on to describe the split verdict and the TIRC findings that led to the second retrial in 2020. This undisputed background information provides no evidence of Trutenko's alleged *mens rea*.

¶ 149   And neither does the testimony that was already in evidence at the bench trial. This much should be obvious from the simple fact that these were conversations between Fangman and Trutenko. Nobody else did, or could, testify to them. So *only* the communications between

Fangman and Trutenko speak directly to Trutenko's mental states. And *only* the fact, as Fangman would have it, that Trutenko was *repeatedly* put on notice of the materiality of the concealed information provides evidence that his ongoing failures to disclose were not inadvertent.

¶ 150  In sum, the Trutenko-Fangman communications have unique probative value to the *mens rea* and materiality elements of certain obstruction and official-misconduct charges. Fangman's statements to Trutenko are admissible where they serve these non-hearsay purposes.

¶ 151                                                    C

¶ 152  Naturally, the communications also included statements made *by* Trutenko *to* Fangman. The trial court did not find them to be hearsay, but it did find them irrelevant, for this reason: Trutenko was explaining his role in Wilson's 1989 trial, but the indictment only charged his 2020 conduct. So Trutenko's earlier role in the case was just "background," with no direct relevance to the charged offenses.

¶ 153  In particular, the trial court ruled in this context that the 1989 federal plea that Trutenko negotiated for Coleman and failed to disclose to Wilson was not relevant because "the indictment here *** does not charge Trutenko with a failure to disclose a federal deal."

¶ 154  But it does and then some. Count 2 alleges that Trutenko committed perjury when he testified that he did not know or remember anything about Coleman's federal plea deal. Specifically, he testified that "I don't know why he was admitted to the Feds, and I don't know what happened on his federal stuff. I don't even know what his federal stuff was other than it looks like he had some type of bank fraud ***. As I sit here now I don't remember what that was." Later: "I'm saying I don't remember anything about anything on the federal level." And

when asked if he spoke to federal prosecutors on Coleman's behalf, Trutenko testified, "I don't know. I have no recollection of any of that."

¶ 155   According to Fangman, as detailed in the proffer, Trutenko engaged him in explicit and "substantial" discussion of Coleman's plea deals, including the federal plea deal, in some of their September 2020 conversations leading up to the 2020 Wilson trial. Trutenko's alleged ability to recall and discuss the particulars of that plea deal only days before his testimony is obviously and directly relevant to whether he *knowingly* made false statements on the witness stand, as required for the offense of perjury. 720 ILCS 5/32-2(a) (West 2020). Here, too, the Fangman-Trutenko communications have unique probative value for the State's proof of a required mental state.

¶ 156   Returning to Count 6: the trial court failed to grasp that the official misconduct charged in this count dates back to 1989 and encompasses Trutenko's failure to disclose the federal plea deal. The theory of this charge, in a nutshell, is Trutenko's continuing failure to comply with his *Brady* and *Giglio* obligations to disclose exculpatory and impeachment evidence, failures that began in his role as prosecutor in Wilson's 1989 trial. See *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).

¶ 157   The indictment thus alleges that Trutenko "failed to disclose *as prosecutor of Jackie Wilson's 1989 murder case*, exculpatory evidence or impeachment evidence regarding William Coleman" and further failed to disclose this evidence, in violation of his continuing *Brady* and *Giglio* obligations, before his 2020 testimony. (Emphases added.) See *Fields v. Wharrie*, 672 F.3d 505, 515 (7th Cir. 2012) ("[A] prosecutor's *Brady* and *Giglio* obligations remain in full effect on direct appeal and in the event of retrial.").

¶ 158   So Trutenko's dealings with Coleman in 1989, including his involvement in the federal plea deal, are not innocuous "background" information with no direct relevance to any charged conduct. They are *part of*—the beginning of—the official misconduct charged in Count 6, based on Trutenko's continuing failure to disclose material information to Wilson. The facts and circumstances of this conduct are hardly irrelevant, and Trutenko's representations to Fangman about these matters are thus probative of whether he "[i]ntentionally *** fail[ed] to perform any mandatory duty as required by law." 720 ILCS 5/33-3(a)(1) (West 2022).

¶ 159   Count 7 also charges Trutenko with official misconduct, based on the same alleged concealments of information about Coleman. The only difference is the source of the disclosure obligation: Count 6 is based on *Brady* and *Giglio*, whereas Count 7 is based on Illinois Rule of Professional Conduct 3.8 (Ill. R. Prof'l Conduct (2010) R. 3.8 (eff. Jan. 1, 2010)). Either way, the theory of relevance is the same.

¶ 160   Lastly, Trutenko's own statements are not cumulative, for largely the same reasons that Fangman's statements are not cumulative. They provide evidence of the mental states required to prove various charged offenses. This unique probative value cannot be replicated by Trutenko's testimony at the 2020 Wilson trial, the brief stipulation entered at the start of the bench trial, or the testimony of any witness who was not a party to the conversations at issue.

¶ 161                                             D

¶ 162   In sum, we cannot accept the trial court's characterization of the Fangman-Trutenko communications as a dispensable mix of hearsay, irrelevant "background" reading, and cumulative evidence of undisputed, stipulated conduct that has always been evident from

Trutenko's testimony and other aspects of the Wilson record. In a case that charges perjury, obstruction, and official misconduct, it is hardly surprising that the real issues of proof turn on whether the concealments and false statements were made with the requisite knowledge and intent. The Fangman-Trutenko communications are the principal, if not the only, evidence that is directly probative of these offense elements.

¶ 163    True, the trial court did not completely bar Fangman from testifying. But the trial court's *sua sponte* evidentiary rulings, layered atop the erroneous finding of privilege, limit the State's potential use of this evidence to a degree that truly hobbles its case. And those rulings have no reasonable justification in the elements of the State's burden of proof or in any rule of evidence that has been cited to us. Those communications, generally speaking, are plainly admissible on the various grounds we have explained.

¶ 164    That said, we have tried not to specify precisely which communications are relevant and admissible for each stated purpose. We have been placed in the unusual position of reviewing evidentiary rulings not after the trial but *during* it; the unique posture of the case made that unavoidable. We had no choice but to dive into some particulars on the hearsay question, though we emphasize again that individualized hearsay objections may be well-taken on remand, consistent with what we have said here.

¶ 165    On the question of cumulativeness, we do not mean to imply that the court must admit *all* evidence of the Trutenko-Fangman communications proffered by the State. While they are not cumulative of *other* evidence, they may, at some point, become cumulative in and of themselves. We appreciate that the trial court has tried to run a tight evidentiary ship in a complex case. But

we also take the State's point, for example, that there is evidence of Trutenko's *mens rea* to be gleaned from the sheer fact that Fangman, on his account, *repeatedly* told him what was at issue in the 2020 Wilson trial. The State is entitled to reasonable leeway to make valid points such as this.

¶ 166    There are delicate balances to be struck here, and we think the trial court, in conjunction with the parties, is in the best position to strike them. However those details are worked out, in the small, they must faithfully implement the theories of relevance and otherwise abide by the principles of evidence set forth in this opinion.

¶ 167                                                    IV

¶ 168    At oral argument, as he did in unsuccessfully seeking dismissal of this appeal, codefendant Horvat argued that we lack jurisdiction to hear this Rule 604(a)(1) appeal insofar as it pertains to him as codefendant. His counsel argued that the trial court's order "had nothing to do with the case against Andrew Horvat." Counsel noted that Horvat was not present or even involved in this matter until after the Trutenko-Fangman conversations at issue took place. Nor did Horvat even participate in the evidentiary hearing held by the trial court. We find no defect in the court's jurisdiction as far as Horvat is concerned.

¶ 169    As discussed, Illinois Supreme Court Rule 604(a)(1) (eff. Oct. 19, 2023) provides in relevant part that "[i]n criminal cases the State may appeal only from an order or judgment the substantive effect of which results in *** suppressing evidence ***." A Rule 604(a)(1) appeal on this ground requires two things: an order that, in substance, suppresses evidence, and a certification from the State that the order substantially impairs its prosecution of the case. *Sneed*,

2023 IL 127968, ¶ 37; *People v. Young*, 82 Ill. 2d 234, 247 (1980).

¶ 170    As to the first requirement, we have already explained that the substantive effect of the trial court's order here—whether based on privilege or one of the evidentiary grounds—was to suppress evidence; it wholly barred from the factfinder the substance of conversations between Fangman and Trutenko in September 2020. See *Sneed*, 2023 IL 127968, ¶ 56; *Holmes*, 235 Ill. 2d at 70; *Drum,* 194 Ill. 2d at 485.

¶ 171    Horvat does not dispute that finding; he concedes that the court's order "suppressed evidence" for the purposes of Rule 604(a)(1). But he says it did not suppress evidence as to *him*. Those conversations, he claims, are relevant to the case against Trutenko but not to him.

¶ 172    We reject that argument for two reasons. First and foremost, the State certified that the order at issue substantially impaired its prosecution of Horvat. Our supreme court has been clear that "[i]n examining a certificate of substantial impairment, this court 'rel[ies] solely upon the good-faith evaluation by the prosecutor of the impact of the [appealable] order on his case,' and it is not the role of reviewing courts to second-guess that evaluation." *Sneed*, 2023 IL 127968, ¶ 38 (quoting *Young*, 82 Ill. 2d at 247). That is all we need say.

¶ 173    But second, even were we inclined to second-guess the State, we would agree with its assessment. First, the suppression order entered in this case applied to Horvat's trial as much as Trutenko's. The order itself, incorporating the court's oral findings and rulings, made no distinction between defendants. Nor would it have made any sense to do so. If the content of the conversations between Trutenko and Fangman were protected by the attorney-client privilege, as the trial court believed, the substance of those conversations could not be disclosed in either trial.

¶ 174    Nor do we agree that the Trutenko-Fangman conversations have "nothing to do with the case against" Horvat. Horvat is accused of covering up Trutenko's alleged wrongdoing. If the State is unable to admit the substance of the Trutenko-Fangman conversations, it will be significantly thwarted in its ability to prove that underlying wrongdoing. Surely the outcome of the case against Horvat is measurably impacted, if indirectly, by the outcome of this appeal.

¶ 175    Indeed, Horvat's counsel seemed to recognize the significance of Fangman's testimony when he told the trial court during a pretrial hearing that "the way I look at this case[,] there are two witnesses, Paul Fangman and Larry Rosen, that is the case against my client and I think those are the only two relevant witnesses."

¶ 176    So there is no jurisdictional defect with this appeal insofar as Horvat is concerned. He is being tried jointly with Trutenko. He does not object to that joinder. Indeed, in pretrial proceedings below, his counsel told the court that "[a]t this point, Judge, I don't believe that on behalf of Mr. Horvat we have any basis to seek a separate trial." And the evidence at issue in this appeal is relevant to the prosecution against him.

¶ 177    We thus find no flaw, jurisdictionally or otherwise, in Horvat's participation in this appeal as a codefendant.

¶ 178                        CONCLUSION

¶ 179    The circuit court's November 8, 2023, order is reversed. The cause is remanded for further proceedings consistent with this opinion.

¶ 180    Reversed and remanded.

Nos. 1-23-2333, 1-23-2334 (consolidated)

---

***People v. Trutenko*, 2024 IL App (1st) 232333**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 22-CR-1350201, 22-CR-1356801; the Hon. Daniel B. Shanes, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | David H. Hoffman, Robert N. Hochman, Marisa E. Levitt, and Stephen Beemsterboer, of Sidley Austin LLP, Meredith R. Aska McBride, of Goldman Ismail Tomaselli Brennan & Baum LLP, and Lawrence Oliver II, all of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | James P. McKay Jr., of Tomasik Kotin Kasserman, of Chicago, Terry A. Ekl and Tracy Stanker, of Ekl, Williams & Provenzale LLC, of Lisle, and Brian T. Sexton, of Law Offices of Brian T. Sexton & Associates, of Naperville, for appellees. |

---